# COVENEY *v.* CONLIN.

HUSBAND AND WIFE; CONTRACTS; MUTUAL WILLS; EVIDENCE; STARE DECISIS.

1. While under certain concurring conditions a verbal agreement to devise property may be enforced in equity, yet one of the essential conditions is that the agreement must be complete, definite in its terms, and proved with clearness and certainty; *following* Whitney v. Hay, 15 App. D. C. 164.

2. It is not sufficient evidence of an oral contract between husband and wife to devise all of the property which either then had or might die seized of, wherever situated, to the other, for the survivor to show that at a time prior to the purchase of certain real estate by the decedent in this District, they made mutual wills in which each conveyed to the other " all my estate real and personal, and such as I shall die seized and possessed of, wheresoever and whatsoever."

3. Where such a contract was alleged to have been made in the State of New York where the parties resided, and such wills were executed there, and the contract is sought to be enforced in this District so far as real estate located here is concerned, a decision of the Court of Appeals of New York upon the question involved,

while it will not be accepted by this court as controlling the question of title here, will be followed if this court be satisfied of the soundness of the reasoning by which it is supported.

No. 1198.   Submitted May 21, 1902.   Decided June 28, 1902.

HEARING on an appeal by the complainant in a cross-bill in a suit for partition from a decree of the Supreme Court of the District of Columbia, dismissing her cross-bill and directing a sale of certain real estate described in the proceeding, for purposes of partition.                    *Affirmed.*

The COURT in the opinion stated the case as follows:

The original bill in this case was filed by Benjamin F. Conlin to obtain partition of lots 23 and 24 in Alley and Page's subdivision of square 92 in the city of Washington.

William J. Florence died November 19, 1891, seized and possessed of the said lots.

The real name of William J. Florence was Conlin, but he adopted the former name in early life when he became a professional actor.

The plaintiff is a brother of said William J. Florence (Conlin), and among the defendants are other brothers and sisters and nephews and nieces of said Florence. The remaining defendant is Annie Teresa Coveney, the surviving widow of said Florence, who has since married Coveney.

The allegation of the bill is that said Florence died intestate as to said lands, and that the title to the same passed to the plaintiff and defendants (save said Annie Teresa Coveney, but subject to her right of dower) as tenants in common.

Annie Teresa Coveney answered the bill alleging that on May 5, 1876, the said Florence executed a valid will whereby he devised and bequeathed to her all of his estate of every description whatsoever or wherever situated; that said will had been admitted to probate in the county and State of New York after the death of the testator; and that a certified copy of the same had been duly registered in the Orphans' Court

of the District of Columbia. Other allegations of this answer are repeated in defendant's cross-bill and need not be here stated.

The cross-bill of the defendant Annie Teresa Coveney alleges the following facts: That she married William J. Florence in the city of New York, January 1, 1853, and lived with him until his death in said city November 19, 1891. That they were both professional actors, and it was agreed between them that they should assist each other, and whatever income or profits should be derived from their engagements should be common property and become the property of the survivor; and further that the same should be invested in real estate and good paying securities for their benefit and the benefit of the survivor; and that said Florence always received said income and invested it as agreed. That there was no issue of the said marriage, and the parties having accumulated their property by their joint efforts, and having in view the statute of the State of New York as to the scope of a will devising all of one's real estate, mutually agreed that each should devise and bequeath to the other all estate, real and personal, that each had or should afterwards acquire and die seized and possessed of. That in pursuance of said agreement said Florence made a will in favor of his wife, and she made a similar one in his favor. That said will of W. J. Florence, hereafter recited, was probated, etc. (as above stated in reciting the answer).

" 11. That after making of the said will and the acquiring of the said real estate hereinbefore described the said William J. Florence again and again reiterated his understanding of the agreement under which the said wills were made, and declared it to be his understanding that his will then executed and after his death admitted to probate and record in the said State of New York and the District of Columbia included the said real estate hereinbefore mentioned, and that on his death it vested in this complainant, her heirs and assigns; and, further, the said William J. Florence made said agreement in good faith, and fully believed that he had made a valid will pursuant to his said

agreement with this complainant, and that it included all property, both real and personal, of which he should die seized and possessed and whenever acquired; and your complainant further avers the fact to be true that said William J. Florence, to show his intention of carrying out his compact or agreement aforesaid with this complainant and to show that he fully believed he had carried out said compact and agreement, and in order that your complainant might know what property would come to her upon his death, he, said William J. Florence, in the summer of A. D. 1891, and shortly before his death, gave to your complainant a list of the securities and assets of his estate, including, among other things, the aforesaid described real estate, to wit, as ' lot 21st street in the city of Washington.' "

The heirs at law of said William J. Florence were made parties to this cross-bill, and the prayer was for a decree against them declaring the title of said Annie Teresa Coveney to the said lands to be absolute, and compelling them to execute a conveyance for that purpose, and so forth. Issue was joined by the answers of the defendants to the cross-bill.

The will of William J. Florence referred to in the answer and cross-bill reads as follows:

" I, William J. Florence of the city of New York, do make publish and declare this my last will and testament in manner and form following, that is to say:

" First. I order and direct that all my just debts and funeral expenses be paid by my executrix hereinafter named so soon after my decease as the same can conveniently be done.

" Second. I give devise and bequeath unto my beloved wife Anna Teresa Florence all my estate real and personal and such as I shall die seized and possessed of wheresoever and whatsoever. To have and to hold to her heirs and executors administrators and assigns according to the nature and quality of the estate forever.

"And I do nominate and appoint my said wife executrix of this my last will and testament.

" In testimony whereof I have hereunto set my hand and seal this fifth day of May one thousand eight hundred and seventy-six."

It is conceded that this will was inoperative to pass the after acquired land in the District of Columbia, as the act of Congress of January 17, 1887 (24 Stat. 361), which permits such devise when it shall appear that such was the intention of the testator, is limited to wills executed after its passage.

A will was executed at the same time by Annie Teresa Florence, and attested by the same witnesses, which in the same words made William J. Florence her sole devisee and legatee, as well as executor; and both were deposited in the same place.

The following is the memorandum of property items referred to in the cross-bill:

" List of Securities and Assets in Account of W. J. Florence.

SATURDAY, May 23rd, 1891.

Owned by Mrs. Florence, lot in Brooklyn, 16th street.

Owned by Mrs. Florence, lot and house, 62 Park ave., N. Y.

164 shares of Eagle Fire Co. stock, $40 per share, par value 6,560. Interest due April and October.

3 bonds 6 per cent Metropolitan Gas Co., $500.00 each, $1,500. Interest payable February & August.

Certificate for 130 shares of Consolidated gas stock, par value $13,000. Pay usually December & June.

5 6 per cent bonds, each $1,000. Bushwick R. R. (street) Brooklyn, N. Y., payable January & July, $5,000.

Correct list, 1891. W. J. Florence.
Continued.

100 shares San Miguel Gold Place Co., $10 per share. Don't know value it was given me.

25 shares German-American Insurance Co., each share $100. Par value $2,500. Interest payable January & July.

Lot on Connecticut avenue, bounded by 21st street, in the city of Washington, valued at $30,000. Cost me $16,500.

Have 9771 60-100 loaned on bond and mortgages in Washington city 6 per cent Thos. J. Fisher, Esq., & Co. hold notes, No. 1324 F street, Washington, D. C.

This is a correct list of securities & given to my wife July, 1891.                                W. J. FLORENCE."

This was in the handwriting of a bank clerk, save the last line and the signature.

The land in controversy was bought by William J. Florence at a judicial sale and conveyed to him by the trustee, April 22, 1887. The price paid was $15,712.50, of which $5,712.50 was paid cash, and the remaining $10,000 were represented by a note due in five years, with privilege of anticipation by the maker in sums of not less than $500 at one time, and secured by trust deed upon the property. It was proved that W. J. Florence paid $5,000 upon the note October 28, 1887, $1,000 on October 17, 1888, and the residue sometime in the year 1889.

Upon the pleadings and the evidence offered in support of the same, the court passed a decree, dismissing the cross-bill, and ordering a sale of the property for the purpose of dividing the proceeds, for which purpose trustees were appointed. From that decree Annie Teresa Coveney has appealed.

[The opinion of the lower court, which was delivered by Mr. Justice HAGNER, on the 3d day of March, 1902, was as follows:

There can be no doubt that before the passage of the act of the 17th of January, 1887 (24 Stat. 361), after-acquired real estate within the District of Columbia would not pass to a devisee to the prejudice of the heirs-at-law, even though an express devise thereof, as after-acquired lands, had appeared in the will.

The act referred to provided that any will thereafter executed from which it *shall appear* that *it was the intention of the testator to devise property acquired after the execution*

of the will shall be deemed, taken, and held to operate as a valid devise of all such property. But the act is expressly prospective in its terms, and could not govern a will previously executed, and no such intention clearly appears from the language used in the will before us.

Assuming in behalf of the widow that the provisions of the will devising all the testator's property " *wheresoever* and *whatsoever* " that he should die seized and possessed of would pass after-acquired real estate situated in the *State of New York,* the contention of her counsel that it would be equally effective within the District of Columbia cannot be sustained.

The devolution of real estate under wills is governed by the *lex rei sitæ,* while with respect to movable property the *lex domicilii prevails.* 1 Jarm. 1, 2. Unless this were so, an holographic will, without any witness, and leaving real estate to an ecclesiastical body as such, made on the day of the testator's death, in a State where such wills are effective, would be operative in every other State, though such dispositions were expressly forbidden by their laws.

As this contention cannot be admitted, the right of the widow to the land must be maintained, if at all, upon the other ground set forth in the cross-bill, that by force of the alleged agreement or contract between Florence and his wife, and of the execution of mutual wills in accordance therewith, the widow became entitled to receive the after-acquired real estate from her husband upon his death; that the omission of the testator in not providing adequately for the devolution of that property by a proper form of will should not be allowed to defeat the just right of the widow under the agreement or contract, and that the heirs-at-law should therefore be compelled in equity to supply the omission of the testator and perfect the title to the widow.

It is unnecessary to go into a lengthened examination of the great number of cases referred to in support of and in opposition of this contention. The general principles underlying the subject are admitted, and the inquiry may be confined to the consideration of the question whether the contract

or agreement alleged is established as required by the rules of equity controlling the subject.

In two recent treatises on the law of wills, Underhill and Page, the authors present the principles very clearly. I read from section 13 of Underhill on Wills:

SEC. 13. " The revocation of joint and mutual wills.— Mutual wills, whether joint or several, are revocable by either testator during the lifetime of the other so far as his disposition of property is concerned, without notice to or consent of the others, unless the making of the will is the result of a contract by which each has agreed to devise his property to the others.

" If two testators who have united in the execution of a mutual will have devised their property to each other so that the devises form a mutual consideration, neither, after the death of the other and the probate of the will *as to his property,* is at liberty, after accepting the benefit conferred, to repudiate the contract to the injury of the heirs or next of kin of the testator who predeceased him. The mutual will was made upon condition that the whole shall be but one transaction. If the will is not revoked during the joint lives of the testators, he who dies first has a right to rely upon the promise of the survivor. He has fulfilled *his part* of the agreement, and it is not just to his representatives to permit a revocation when he has been prevented from revoking his will by a reliance upon the other's promise. It is too late for the survivor, after receiving the benefit, to change his mind because the first will is then irrevocable. It would have been differently framed, or perhaps not at all, if it had not been for his inducement. And where husband and wife make mutual wills in favor of one another, and subsequently are divorced, dividing the property between them, and the wife revokes her will by destroying it, a revocation of the will of the husband will be implied from the alteration in the circumstances of the parties. So mutual wills made by two sisters, *each* devising all her property to the other, are revoked as to the will of either on her marriage, though the sister marrying dies without issue in the belief that her will

was unrevoked." See also Page on Wills (1901), Sec. 67 *et seq.*

Sec. 69. "As to revocability of mutual wills.

" The weight of authority is that joint and mutual wills are as revocable *as wills,* as other wills are (1 Sw. & Tr. 144, *In re Raine; Walpole* v. *Orford,* 3 Ves. Jr. 409)."

" If the joint or mutual will is not made in *pursuance of any contract,* the right to revoke it is beyond question."

" If made as a contract, then, though the will may be revoked, the contract may be enforced in equity to have those taking the legal title hold as trustees."

Sec. 71. " Where such wills are enforceable as valid contracts, they do not stand upon any especially favored footing. In order to be enforceable, they must have all the essential elements of any valid contract."

" There must appear to be a *valid consideration,* and a promise by one to make a will in consideration that another shall make a specified disposition of his property has been held to be a sufficient and valid consideration."

" The conduct of a person who breaks such a contract is not a fraud; though dishonorable, it is only a breach of contract."

Sec. 73. " The contract must, in order to be enforceable, be clearly proved and be certain and unambiguous in all its terms. *Sluniger* v. *Sluniger,* 161 Ill. 270."

" In no other class of contests are parties so likely to fail to come to a definite agreement as in this class, and in no class of cases do the courts look upon the contract to be enforced with greater jealousy. *Id.,* 130 Ill. 445; 113 Ill. 186."

"A mere expression of intention to make a certain disposition of property is of course not valid as a contract; still less are vague offers. *Wilburn* v. *Borer,* 4 Kan. App. 109." See other cases cited in this section.

On behalf of the widow it is also contended that the real estate in controversy was paid for in part or altogether by her individual money, advanced by her for that purpose,

and that the title should therefore be placed in her under the doctrine of a resulting trust.

As the effort in either view is to divert the title from the heirs-at-law in opposition to the provisions of the statute of frauds, it is quite well established that in the absence of writings signed by Florence to the effect claimed the parol proof must be of the most satisfactory character. As declared in *Lord Walpole* v. *Lord Orford,* 3 Ves. 402, by the chancellor, all agreements to be executed in equity must be certain and defined, equal and fair, and proved as the law requires, and his doubts upon those points compelled him to refuse relief.

This is especially the case where the contract and proofs are altogether in parol, and reliance is had upon acts of part performance to obtain a specific execution of the verbal contract or agreement. In such cases the requirements of equity are, 1st, that the alleged contract itself must be set forth in the pleadings with certainty; 2d, it must appear to be fair and just and mutual in its character; 3d, the proof must establish the particular contract alleged, as it will not be sufficient merely to prove that there was some contract or understanding of the general character with that alleged; 4th, the acts of part performance relied on must appear to be referable to the contract alleged and not to some other contract, although similar in its nature; 5th, they must be acts which have been performed by the party seeking the specific execution of the contract and not by the other party; 6th, they must appear to have been injurious to the party performing them, and, 7th, they must be of such a character as cannot be compensated by damages, and unless all these essentials appear the court will not decree specific performance.

As expressed in 67 Md. 373, *Williams* v. *Shipley,* " The proof of such a contract should be of a definite and conclusive nature."

Or, as was said in 20 Md. 62, *Whitridge* v. *Parkhurst,* " The admission of parol evidence to establish such an agreement is in violation of the statute of frauds, unless

of the clearest and most satisfactory kind; and unless the acts of part performance relied upon to take the case out of the statute be clear and definite, and refer exclusively to the alleged agreement." 1 Desauss. 116, *Izard* v. *Middleton.*

And in *Mundorff* v. *Kilbourn,* 4 Md. 459, " These, we think, are to be dealt with no less strictly in equity than other contracts within the statute of frauds. Indeed, there are no considerations which should subject them to a more rigid application of the statute."

The widow, neither in her answer nor in the cross-bill, makes any assertion or suggestion that she had paid any part of the purchase-money of the Connecticut Avenue property. The defendants, however, in their answer, had insisted that the agreement alleged, if it ever existed, would be of no force as to the real estate unless it were in writing, and *also* " *unless the said real estate were purchased wholly or in part with money belonging to the wife, neither of which matters is so alleged in the cross-bill."* And these last words seem to have first suggested to her the expediency of making such a claim; and although several amendments to her pleadings were allowed, it was not until she was being examined in New York in April, 1899, that the idea was presented. Then she testified, in reply to questions of her counsel, that she had lent Mr. Florence $7,000 or more in cash to help to pay for the Washington property (p. 6). She adhered to her statement of this sum throughout the cross-examination (p. 76), and had described the circumstances of the payment and the names of the several persons who were present and the source from which she derived it (pp. 76 *et seq.*) without varying her statement as to the sum paid.

But in the November following, in Washington, Mr. Stellwagen, when testifying, apparently in her presence, as to the sum *due* by Florence as the *cash payment* on the purchase-money of the Washington property, stated the amount to be $5,712.50. When it came to be her turn for re-examination (p. 11 *et seq.*) she said she had been mistaken in testifying that the amount she had advanced was $7,000; that it was not as much as $7,000, but that the sum she gave him to be

paid to the trustees was exactly $5,712.50, the identical sum mentioned by Mr. Stellwagen. But she was again wrong. She supposed that sum represented all the money Florence paid at that time, whereas the entire amount paid to Stellwagen at that time by Florence was $5,752.30, $5,712.50 being the cash payment at the purchase, $37.75 being money due to John Ennis, Esq., and $2.05 due for recording deeds, etc., and this entire amount, $5,752.30, was proved to have been paid by a check of Mr. Florence of April 22, 1887, on the Second National Bank of New York. So, if she had really advanced to Florence the sum really chargeable against him, she would have given $5,752.30 instead of $5,712.50.

Her statement of the amount she then paid was no more correct than any other particular of her story. She had given with great circumstantiality the particulars of a telegram from Ennis urging Florence to make a further payment for fear he would lose all he had previously paid, whereas the fact was, the money then paid by Florence was the first payment he ever made on the purchase, and of course there never could have been any danger of his losing any *prior* payment. It was also proved that he, Florence, had considerably more money in each of two banks in New York at that time than was needed to make the payment; that there never had been any pressure upon him for the money, and that he paid it all off two or three years before the balance was due; so that if he had really told his wife he had no money to make the payment, his statement would have been willfully false.

She also stated that she had afterwards paid other sums of money, $5,000, $2,000, and so on, on the purchase, and mentioned the period between which she thinks she paid them; but beyond her unsupported statement there is no proof whatever of such payments. She said the first advance was made on an occasion when several persons were present in Florence's parlor in the Fifth Avenue hotel, in New York; that Mr. Florence was very much concerned about a telegram he had received from Mr. Ennis, who was his counsel in Washington, in these words, or to the same effect, as stated

by Mrs. Coveney and the maid Nerini: "Dear Billy: You must send on the mortgage money or you will lose your property," or "lose what you have already paid." Mrs. Coveney adhered almost literally to what she said, especially to the statement that there was danger of losing what he had already paid if he did not at once send on the sum required. The trustees and all the other witnesses prove there was never any pressure upon Florence to pay — that he did not avail himself of the time allowed him; and an entry in Mr. Ennis' book shows that he sent on the final deed to Florence at least two or three years before the last payment was due. If Florence really received that telegram, he must have thought Ennis had gone crazy. Mrs. Coveney proceeds to say she sent Nerini forthwith down to the office in the Fifth Avenue hotel where she says her money was kept to obtain the amount to lend Florence. The proprietor of the hotel said if he had had any idea that there was any such sum of money there he would have been very particular about taking charge of it, though of course nobody would think of putting a box with such a sum of money in the hotel office. Nerini said Mrs. Florence opened the box, took out $7,500, and gave it to Florence, and he sent it off, saying, "This goes to Ennis." Then, Mrs. Coveney says, she put the rest of it back, and when she next went to Europe she spent it on dresses. In explaining how she obtained the money, she said Mr. John W. Mackey had given them a gold brick in California, worth $25,000, which they sold, and that it was part of this money she lent to Florence. Mackey, instead of being in Paris or San Francisco, chanced to turn up in New York, and when examined about the gift he declared he never gave either of them a gold brick worth $25,000, or any money or any brick at all.

She further said she knew Larry Jerome was present at the time, and also Mr. John McCullough and a gentleman named Hecksher, who was sitting near the window, smoking a cigar. Hecksher happened to be the only person of those named who was still alive, and when examined he testified that, though he had been in Florence's rooms occasionally, Flor-

ence had never "talked shop," which meant he had never talked about business with him on any of these occasions, and he denied that any such thing ever occurred in his presence. When asked if it might not have occurred while he was sitting in the window, smoking, he answered that it happened he was not a smoker at all at that time, and had only begun to smoke about two years before his testimony was given. With respect to her statement that John Mc-Cullough was present, it was proved that John McCullough was dead at the time referred to, and that for two years prior to his death he had been confined in an insane asylum.

With every desire to avoid dealing harshly with the complainant, unfortunately, I cannot say, it is possible to believe any part of this remarkable story. Can it be doubted that Mackey never gave her a gold brick; or that Florence was under no necessity to borrow money to pay on the Washington lots; or that she did not pay either of the different sums of money she claims to have paid on the purchase; or that no such telegram was sent by Ennis or received by Florence; or that neither Jerome nor Hecksher nor McCullough was at the alleged meeting, and that no such incident occurred? And inasmuch as Mrs. Florence must have known that each feature of the story was absolutely false, so that she could not possibly have been mistaken about its falsity, can the court hesitate to reject her entire testimony as coming from a source utterly unworthy of belief, upon the authority of the *Santissima Trinidad,* 7 Wheat. See also *Oliver* v. *Cameron,* Mackey & MacArthur, 245.

A good deal is said to support the idea that Mr. Ennis, if living, would support the present claim of Mrs. Coveney. But Mr. Ennis lived until November, 1896. This bill was filed in February, 1895, Mr. Ennis being one of the counsel and signing it as such. The answer of Mrs. Coveney was filed February 3, 1896, and on the same day the cross-bill was filed. Mr. Ennis was still living and was one of their counsel in June, 1896, when the defendants filed their answers denying every particular of Mrs. Coveney's cross-bill from beginning to end. What would be his position in the

present aspect of the case if he were now living? Can it be assumed that he would have been instrumental in voluntarily joining with the heirs-at-law in bringing this suit to deprive the widow of her property, if he had really done what Mrs. Coveney swears he did and said about the purchase?

In Nerini's testimony she is asked if she had not been sent for by Mrs. Coveney and offered $500 to testify in her favor, and if she did not say to Mrs. Coveney that she did not want that, but she would take a trip to Europe, if Mrs. Coveney would pay her expenses, and she answered in the negative. She was then asked if she had not told Elliott she had this conversation with Mrs. Coveney, and she also denied this. Elliott swears positively that she did not tell him so; and when Nerini is asked about this on cross-examination she repeats she did not tell this to Elliott, but admits she did say so to her husband. These circumstances are not commendatory of the reliability of Nerini's testimony. But there are other objections to it.

Mrs. Coveney, on her first examination, testified that Nerini was in her service for eleven years and left her in 1883. After it had been pointed out that the loaning of the money must have taken place in 1886, three years after Nerini had left, Mrs. Coveney's counsel on her subsequent examination said to her, " You stated that Nerini was present when this money was loaned by you to Florence, and that you sent her down to get the money for this loan. But you stated first, that she was not in your employment after 1883 — after she was married — and this thing occurred in 1886. How do you account for this ? " She did not account for it in a very satisfactory manner, for her reply was that *"Nerini was mistaken in the dates."* But the mistake was not in the dates, nor by Nerini, but in the pretense that Nerini had brought up the box from the hotel safe three years after she had left her service at the hotel. The further attempt of both Nerini and Mrs. Coveney to reconcile these contradictions by the suggestion that Nerini had become a dressmaker after she left complainant's employment, 1883, and after that time had

called at the hotel frequently, was a very lame explanation of the difficulty.

After Nerini admitted she told her husband she did not want the $500, and that she did want a trip to Europe instead, her denial that she had said this to Elliott becomes rather improbable. Elliott was not at all interested in the cause, whereas Mrs. Coveney was, and so was Nerini to the extent of $500 in prospective, according to the testimony. In fact, Mr. Conlin, who testified only as to the pedigree, is the only witness examined on behalf of the heirs-at-law who has any interest in the result at all.

The entire testimony adduced by Mrs. Coveney as to her alleged payment on the purchase-money fails to establish her contention, and the court must therefore reject the entire story, as is manifestly its duty.

The remaining inquiry relates to the existence of the alleged contract or agreement between Florence and his wife, which, it is insisted, was the motive or cause of the execution of the two wills. A careful examination of the numerous decisions adduced by the respective counsel has satisfied me of the necessity of establishing such an agreement in addition to the proof of the mutual wills; but I shall not consume time in considering the particulars of these cases. The draughtsman of the cross-bill showed his appreciation of this necessary part of his case by setting forth the existence of an antecedent agreement, the motives of the husband and wife in entering into it, and the particulars of the contract in accordance with which they had executed mutual wills, designed to vest in each other reciprocally all the property of which each should die seized. Both upon principle and authority such an agreement and its establishment by adequate proof are indispensable to the success of Mrs. Coveney in this controversy.

It would be an astonishing thing if the mere execution of mutual wills, the result perhaps of a passing fancy, should so tie the hands of the two testators that each, without notice to the other, would be powerless to change his will, as every person under ordinary circumstances has full right to do.

The testators may have drifted half the world's circumference asunder, so that no notification could be possible; one might have married and become the parent of a child; one might have become enormously rich and the other insolvent; or other circumstances might have developed which ordinarily would invalidate a will; and yet the rash testators are to be held bound by such mutual wills entered into without any contract, even such as would be required to be shown about a trivial bargain about insignificant merchandise.

Although mutual wills in themselves might contain a sufficiently formal contract or agreement expressed in terms, yet the mere existence of mutual wills containing no statement or proof of such agreement would have no such effect. In the recent and important cause of *Edson* v. *Parsons,* 155 N. Y. Reports, it was held that an agreement to execute mutual wills is not established by the fact that parties make similar wills with cross-provisions in favor of the survivor, and that to establish an agreement for mutual wills, and defeat the right to revoke a will, there must be full and satisfactory proof of the agreement, which cannot be supplied by presumption.

That cause was argued by most distinguished counsel, and the judgment in the Supreme Court (85 Hun, 263), was affirmed by all the judges who heard the argument.

The facts there attending the execution of the mutual wills were much more conducive to the establishment of an antecedent agreement than those in the present case. The two testators were elderly unmarried sisters, greatly devoted to each other. The diaries kept by each were produced in evidence, and they evinced that for some time they had been contemplating the execution of such wills and were in consultation with the same counsel who prepared both wills, which were executed the same day, in the presence of the same witnesses, and deposited in the same box in a safe deposit company. Their provisions were identical. I will read an interesting extract to show how strong the circumstances were (pp. 562–3, 155 N. Y.). These two sisters were devoted to each other and to their brother.

"After Tracy's death, Mary and Susan continued to reside together in the same house, united by ties of the strongest affection and leading lives of singular uniformity of thought and action. It might be said that their lives ran in one groove and, judging from extracts from their diaries put in evidence, were so blended, that they seemed to experience the same emotions, to view occurrences with the same eyes and to be moved to the performance of common acts. Thus it was, that they spoke of and planned their testamentary dispositions together; together visited their lawyer and, ultimately, executed, on the same day, before him and the same witnesses, wills having similar schemes for the distribution of their estates after death should separate them. There can be no doubt, but that their wills evidence a conclusion, which was reached by them after discussion and deliberation, as to the most advisable plan for the disposition of their property and we may fairly infer from the evidence that it was prompted by a desire, after making many charitable and benevolent gifts, to keep the surplus in the family, by giving it to their brother Marmont. They were, plainly, not ordinary wills, for each testatrix undertook to make a testamentary disposition contingent upon the survivorship of the other and it is in that feature, that, in truth, the contention of the appellant finds its support. That is, that there was a mutual representation that, in consideration of these identical and cross-provisions in the two wills, the survivor would adhere to and carry out the provisions of her will; a representation upon which, when one of them should die, it should be presumed that she had placed reliance, and because of which, therefore, a court of equity would see to it that the testamentary provision made should not fail, through a diversion of the residuary estate into other hands by a subsequent will.

" But, as it seems to me, an insurmountable difficulty, assuming that the contention might dispose our minds favorably to its reception, limits the province of our views. A pivotal question of fact was presented in the trial court and was there disposed of adversely to the plaintiff. The position

taken by the plaintiff was that Mary and Susan Edson had entered into a mutual agreement to execute mutual wills. The distinct and controlling issue in the case was there and the trial court found, upon the evidence, that the plaintiff had failed to prove that the wills were made pursuant to any agreement, or that they were mutual wills, and, therefore, dismissed the complaint upon the merits; holding that the property of Mary was not charged with any trust, or duty, and, at her death, passed under her subsequent will, absolutely, or as qualified by any trust provisions therein."

In Underhill on Wills, to which I have already referred, this point is thus discussed much better.

SEC. 288. " Effect of the statute of frauds on promises to devise land.

"A parol promise to devise land is void under the statute of frauds. So an agreement by virtue of which the promisor binds himself to leave all his property, real and personal, to the other contracting party, being void as to the real estate under the statute of frauds, will not be enforced in equity as regards the personal property where the contract is one and indivisible. Failing in part, it may be set aside altogether. But a part performance of the contract to devise by the plaintiff will prevent the application of the statute of frauds, and he may then recover from the estate of the promisor under a *quantum meruit.*"

Referring again to Page on Wills, we find at sec. 74 that contracts to devise real property are within the statute of frauds, and the contract cannot be proved by parol, as where the contract is to leave all one's property, both real and personal, to another. 48 Ohio St. 25.

On the subject of part performance, Page —

SEC. 76 discusses what is a breach of such contracts, where the party omitted to make the will through negligence, or in good faith thought he had done so. See 21 Mont. 251; 53 Pac. 742; 46 S. W. Rep. 477, Tenn., *Green* v. *Organi.*

SEC. 79. In suits for breach of contract in England, the contract must be clear and certain, fair and reasonable, in order to bind.

SEC. 81. Evidence.— Legally neither party can testify in such actions, the promisor being dead and the promisee being prohibited from testifying as to transactions with the promisor in his lifetime. *Newton* v. *Field,* 98 Ky. 186.

SEC. 82. Evidence that the will was made and that the act alleged as a consideration was done, does not establish the existence of a contract. *Edson* v. *Parsons,* 155 N. Y. 555. See, also, 118 Mo. 660, *Peters* v. *Flanders.*

Again referring to Underhill on Wills —

SEC. 289. "As to revocability of wills made in carrying out a contract to devise.— The general rule under which the revocable character of wills is universally admitted to exist, is subject to a seeming exception, viz.: where the execution of the will is a part of a contract to make a will, and the person in whose favor the devise was made has gone into possession and made expenditures upon faith in the contract."

But the acts of part performance must be done by the person seeking the execution of the contract. When one is put in possession of a farm without the execution of papers, and then wishes to compel the other party to the parol contract to perform it, he cannot rely upon such surrender of possession to him as part performance on his part. If, however, the other party wishes to enforce the contract against the fraudulent refusal of the vendee to comply with his part of the contract, he may rely upon his delivery of possession as an act of part performance by him.

" Perhaps it is hardly correct to claim that the will is irrevocable. While the testator may destroy the will or execute another revoking it, the contract itself cannot be rescinded, and will be enforced by the court in favor of the person who has acted upon it. If, however, no specific sum is mentioned to be devised, and the person making the promise merely agrees that he will leave the other party what he may have in his possession at his death, he retains by implication all his rights over his property during life, and may dispose of it by voluntary gift, provided there is no intent to defraud the promisee."

I refer now to sec. 292 of Underhill, because it states the law more favorably to the complainant than the case of *Edson* v. *Edson.*

Sec. 292. " The character and sufficiency of the proof required to establish the contract to devise.

" The burden of proof to establish the making of the contract is upon the plaintiff.

" He must establish it by clear and reasonably convincing evidence. The details of the agreement must appear, and the consideration and the time and place must be shown with reasonable definiteness. An oral declaration by the testator that he intended the plaintiff to have all his property, and the fact that the latter, who was his child, lived with him and rendered such services as are usually rendered by children when members of their father's family, are not enough. Thus, where it is claimed that a promise to devise was made in consideration of services to be rendered, or support to be given, the evidence must be definite and satisfactory as to the character of the services or support. But in many cases the courts have dispensed with evidence of the usual formal execution of a contract, particularly where the parties dwelt together in one family or household. The courts will look to the intention rather than to the form. So, where the deceased had taken the plaintiff, who was his illegitimate child, into his family at an early age, recognized her as his child, gave her an education and board and clothing, and she remained in his household forty years, performing the duties of a daughter to him and his wife until his death, and she had refused advantageous offers of marriage upon the solicitations of the deceased and his suggestions that she would receive his estate upon his death, and she relied upon those suggestions, the court held that a sufficient contract to devise was made out."

Though the facts of the case before me are singularly like those in *Parsons* v. *Edson,* yet they are much less conducive to the establishment of anything like the agreement which I believe to be essential to a recovery than those existing in *Parsons* v. *Edson.* The Florence wills contain in themselves

no suggestion whatever of the existence of such an agreement.

Reliance is placed upon the terms of the paper marked "A. T. C. Exhibit C," as supporting the theory of an antecedent contract to make mutual wills.

This paper appears to be a list furnished Florence by the clerks in the safe deposit company, in which he kept a box, giving a list of its contents. It is dated Saturday, May 23, 1891, and is headed " List of securities and assets in account of W. J. Florence," and all of it except two lines is in a clerkly handwriting. The first entries describe a lot in Brooklyn and a house and lot in Park avenue, N. Y., which are said to be owned by Mrs. Coveney. Then follows a list of four blocks of shares and bonds amounting to $25,060, which fills out the first page, at the bottom of which is written, in Florence's handwriting, " Correct list, 1891. W. J. Florence." On the next page the list is continued and contains a statement of some gold shares " of unknown value," $2,500 worth of shares of an insurance company, and a statement of $9,771.60 loaned on bonds and mortgages by Fisher & Co. in Washington.

Opposite each description of bond or share is the statement of the date when the interest or dividend is payable.

Immediately above the statement of the Fisher loan is this entry, " Lot on corner of Connecticut avenue bounded by 21st street in the city of Washington valued at $30,000 cost me $16,000;" and at the bottom of the last page, in Florence's handwriting, is written, " This is a correct list of securities, I give to my wife. N. Y., 1891. W. J. Florence."

As a conveyance or as a testamentary instrument, the writing is, of course, valueless, and as a declaration of a gift from him of the property therein described it is equally without effect, for what he thereby said he gave to his wife was, evidently, the " *list* " and not the *securities* according to the grammatical sense of the words. He gave her the list, very properly, that she might be made acquainted with the dates and amounts of the dividend and interest coming from the securities.

He could not have meant to say he then gave *the property* therein mentioned to his wife, for the first two pieces of property are distinctly described as already belonging to his wife, and therefore not in his power to give again. As a declaration of something he then gave to his wife, it could not be applicable to the Washington lots, which were never placed in her name with his own, as she said it was agreed should be done with respect to the " partnership " property, for he continued to hold them in his own name until his death. This paper has no probative force or bearing upon the question of the alleged agreement or contract.

The list was a complete one of the entire contents of the box in which he kept the copies of the deeds of the three parcels of land, among them being the deed of the Washington lots which Ennis had sent to him in 1889.

We must look, then, for extrinsic evidence in this case to establish this contention.

There are but three witnesses adduced on behalf of Mrs. Coveney on this point. The first is her daughter, Mrs. Sisson, who says nothing, directly or indirectly, as to any such agreement. The utmost extent of her testimony consists in the statement that Florence told her on one occasion at the Fifth Avenue Hotel, " We have both been downtown and made our wills. I have left everything I own to your mama," whereupon Mrs. Coveney said, " Yes; and when I die, I have left everything to your pa," and that on another occasion shortly before he left for Philadelphia, where he died soon afterwards, he said, " I feel badly, but if anything happens to me your mother will have everything and be well provided for."

The second witness, Christine Nerini, who had been a maid of the Florences for eleven years before 1883, in which year she was married and left their service, testified that Florence always said to his wife, " Don't worry, it will always be well with you," and that whenever they had any trouble he said, " Well, it will be well for you. I don't think I shall live to be very old, and you have helped to save this money for me." And also that a great many years ago

they said whichever should die first should leave it to the other, and he said, "Don't worry, for it shall be all right."

Laying aside the objections to the testimony of Nerini, which I have already considered, it seems to me impossible to hold that the testimony of these two witnesses together can be held sufficient to establish the existence of the agreement alleged in the cross-bill according to the principle laid down in this class of cases, which insists upon the necessity of full and satisfactory proof of the agreement, and which cannot be supplied by presumption.

There remains to be considered only the testimony of Mrs. Coveney. Assuming that it is admissible within a very liberal construction of the decision in the *Stickney case,* 131 U. S. 237, it still cannot be considered as more than the declarations of a widow, testifying after the death of her husband to statements alleged to have been made by him to her, out of the presence of others, the wife, too, being highly interested in the result of the suit, which, if her testimony is accepted, will give to her alone, and thus deprive the heirs-at-law, to whom he seems to have been attached, of all share in his estate.

Her testimony as to the agreement is confined to a few sentences in her New York depositions.

At p. 49 she is asked by her counsel whether there was any agreement or arrangement between herself and her husband after their marriage in regard to their earnings as actor and actress, to which she replies, " We shared alike; we were joint partners in business." " He never bought any property or real estate without consulting me." " In case he should invest money, it should be jointly invested." . " In our conversations it was said that whatever was invested should be invested jointly."

All this has nothing to do with an agreement as to making mutual wills. And, in fact, it appears from her testimony further on that only two pieces of property were ever invested in their joint names, and that the Washington property, which we have seen she claims to have advanced the

money to pay for, in part or wholly, always stood in Florence's name alone.

When further asked whether, before going down to the lawyer's office, she and Mr. Florence had any conversations in regard to the making of their wills, she replied " that in case of his death he was to leave me everything; in case of my death I was to leave him everything." " We had a conversation about Barney Williams' death, and I said it would be well to make our wills, and he said we should do it, and I said, 'And you will leave me everything, and I will leave you everything.' " She does not state that any reply was made by him to this suggestion on her part, and the entire statement seems to stop far short of the mutual agreement required to be proved in such case, and even short of that stated in her cross-bill. I find nothing else in her testimony strengthening these statements.

In view of the great discrepancies everywhere through her evidence with many of the undoubted facts in the case about important matters, concerning which she could not well be mistaken, I find myself unable to credit her statement on this subject (*The Santissima Trinidad,* 7 Wheat.; *Oliver* v. *Cameron,* MacArthur & Mackey, p. 248) and upon her testimony alone to decide against the heirs-at-law in respect of property which has fallen to them by a happy accident, probably not at all at variance with the wishes of the deceased.

I shall prepare a decree dismissing the cross-bill and directing a sale and partition.— REPORTER.]

*Mr. William J. Miller* and *Mr. Joseph Fettretch* for the appellant.

*Mr. J. J. Darlington* and *Mr. James F. Smith* for the appellees.

Mr. Justice SHEPARD delivered the opinion of the Court:

It is unnecessary to review at length the evidence offered by the appellant in support of the claim of her cross-bill.

That has been done by the learned justice who presided in the equity court, in an opinion made a part of the record,* and we entirely agree with him that it utterly fails to make out a single ground upon which a decree for the appellant could rest, whatever view might be taken of the legal propositions embraced in her several contentions.

(1) Instead of proving the alleged agreement between herself and her husband, respecting his receipt of the profits and income of their professional engagements and their investment on joint account and for the benefit of the survivor of them, appellant's testimony tended to show a constant division of the same and their deposit in bank, or other separate keeping, as well as investment on separate account.

(2) The attempt of the appellant to show by her own testimony, that at the urgent demand of her husband, and to prevent the loss of the land in controversy, she advanced the amount of the cash payment therefor, or any part of the subsequent payments in discharge of the deferred payment of $10,000, was an entire failure. In several essential particulars, she was contradicted by indisputable evidence of facts and circumstances, and the only witness who undertook to corroborate her, on any material point, was likewise shown to be untrustworthy.

(3) Whilst there is no doubt that, under certain concurring conditions, a verbal agreement to make a conveyance of property by will may be enforced in equity, yet one of the essential conditions is that the agreement must be complete, definite in its terms, and proved with clearness and certainty. *Whitney* v. *Hay,* 15 App. D. C. 164, 186; *S. C.,* 181 U. S. 77; *Edson* v. *Parsons,* 155 N. Y. 555, 567; *Williams* v. *Shipley,* 67 Md. 373; *Sloniger* v. *Sloniger,* 161 Ill. 270, 278.

The evidence offered by the appellant falls far short of the establishment of any agreement by William J. Florence, containing the requisite ingredients of a contract to make a will devising and bequeathing to the appellant all of the property which he then had or might die seized and possessed of, wherever situated.

---

*See *ante,* p. 308, *et seq.*— REPORTER.

The whole claim of appellant rests, therefore, upon the single fact, that, on May 5, 1876, she and her husband, each impelled by a desire at the time to make the other the beneficiary of her or his bounty, as survivorship might determine, executed mutual wills, similar in form and attestation, and deposited them in a box under their joint control in the vaults of a safe depository, where they remained unaltered and unrevoked until the death of William J. Florence.

But the mere fact of the formal execution and deposit of mutual wills cannot be accepted as sufficient proof of the existence of an anterior agreement or contract of which they are alleged to be the execution.

This is the clearly established rule in the State of New York, where the parties resided and where the wills were made — though it is not on that account to be accepted as controlling the question of title in this jurisdiction. *Edson* v. *Parsons,* 85 Hun, 263, 265; *S. C.,* 155 N. Y. 555, 565, 568.

Some of the conditions of that case appealed more strongly than those in the case at bar for the inference of an antecedent contract from the terms of the mutual wills of two maiden sisters; but it was denied. Of these mutual wills it was said by the court: " They constituted, by their terms, no mutual contract; however reciprocal their provisions might appear. Whether they were reciprocally binding depended upon the existence of an agreement, or a clear understanding, to that effect, and that was, of necessity, left to inference from all the facts which the plaintiff could collate " (p. 565). * * * " The present case afforded ample support to the conclusions reached by the trial court. The wills were similarly made and, hence, showed concert of action and similarity of purpose; but not necessarily a binding agreement of such solemnity and far-reaching consequences, as the appellant claims. To argue upon the basis that they are mutual wills begs the question. That is a fact to be established by evidence, showing that such was the understanding and the deliberate agreement. The scheme was clear; but what shows, conclusively, that each sister under-

stood that the other was irrevocably bound? Is such an inference the only one warranted by the situation and circumstances? This cannot quite be likened to that class of cases, where a devise has been made upon the faith of a promise which equity will enforce when founded upon a sufficient consideration; or where a fiduciary relation exists, which procures the devise to be made upon representations, without which the devisee would not have taken." (p. 570.)

We are not bound by the decision of the Court of Appeals of New York, but being satisfied with the soundness of the reasoning by which it is supported we adopt its rule in the disposition of this case.

The errors assigned by the appellant relate only to so much of the decree as dismisses her cross-bill. Finding no error therein the decree as rendered will be affirmed, with costs; and it is so ordered.                              *Affirmed.*