**Martha MILLER, Executrix of the Estate of Charles E. Taylor, Deceased, Plaintiff,**

**v.**

**Martha M. BUCK, Defendant.**

**65–C–9–C.**

United States District Court
W. D. Virginia,
Charlottesville Division.

Aug. 7, 1967.

Patrick H. Fierro, Fierro & Miele, Williamsport, Pa., Joseph W. Richmond, Richmond & Fishburne, Charlottesville, Va., for plaintiff.

James H. Michael, Jr., Michael & Dent, Robert M. Musselman, Charlottesville, Va., McNerney, Page, Vanderlin & Hall, Williamsport, Pa., for defendant.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

MICHIE, District Judge.

Plaintiff, executrix for the estate of Charles E. Taylor, initiated this action in an attempt to recover for the estate approximately $34,000 in government bearer bonds which were allegedly converted by defendant Martha M. Buck. The primary issue centers around the respective rights that Martha Buck and decedent had in property located in a jointly leased safe deposit box in a Muncy, Pennsylvania bank.

It is unfortunate that counsel were unable to agree on a stipulation of facts in this case which is to be tried by the court without a jury. Their chosen alternative of submitting the case as it now stands leaves at best what one would call a meager record. The present record consists of the depositions of Martha and Earl Buck and Martha Miller and a number of exhibits such as a copy of Taylor's will, certain safe deposit box rental receipts, a document showing the rules, regulations, contract and joint tenancy agreement of the Muncy Banking Company dated 1961 and signed by Taylor and Martha Buck, and several miscellaneous letters and signature cards.

Charles E. Taylor was the original owner of the bonds over which this litigation arises. The incidents surrounding his purchase of these bonds and the subsequent arrangements made for their safekeeping are the pivotal facts upon which this case must turn, and therefore, the ones which must be scrutinized most carefully.

The record shows that Earl Buck, the defendant's husband, was President of the First Blair County National Bank in Tyrone, Pennsylvania, in 1956 when Taylor decided to purchase the bonds in question. On May 15, 1956 Taylor was brought to the bank in Tyrone by his nephew, Charles Moran, and Moran's wife. After Taylor and the couple visited the Bucks for a short time in the latter's apartment located above the bank, Taylor and Earl Buck went downstairs to talk business. Half an hour later, Martha Buck received a telephone call asking her to come downstairs to the bank where the two men were conferring in her husband's office. When she was told of Taylor's wish to invest the money in bonds and then told that Taylor wanted her to be deputy of a safe deposit box defendant admitted that she was somewhat surprised. According to her testimony, Taylor said to Martha Buck: "You know, Mart, if anything happens to me I would like for you to see that these bonds are divided among your brothers and sisters—the living brothers and sisters." Defendant agreed to act as deputy and signed an agreement with Charles Taylor on a safe deposit box signature card. Apparently it was decided that defendant would handle the clipping of interest coupons for Taylor as Taylor was to receive all the interest from the bonds during his lifetime. Both Taylor and defendant obtained a key to this box located in the First Blair County National Bank.

Three years elapsed during which the defendant did act as deputy of the safe deposit box and did clip the interest coupons for the benefit of Taylor. In the Fall of 1959 the defendant told her uncle, Mr. Taylor, that she and her husband were moving to State College, Pennsylvania. Shortly before the move occurred Taylor, according to the testimony of the Bucks, had allowed the bonds to be transferred from his safe deposit box to one owned exclusively by the Bucks. The reason given was that Taylor thought there was no use for him to pay his box rent any longer. When the Bucks moved to State College, they transferred the bonds to a box owned by them there. Apparently, Taylor did not object to the bonds being moved. Defendant continued to mail the proceeds of the interest checks to Taylor from State College twice a year.

In 1961 the Bucks planned to move to Charlottesville, Virginia. They went to see Taylor at his home in Muncy, Pennsylvania, and convinced him that it would be more convenient to leave the bonds in Muncy while they were moving. The tes-

timony indicates that Taylor would have been happy for the Bucks to move the bonds to Charlottesville at that time. He supposedly said: "You should take the bonds to Charlottesville with you because you know you are going to get these bonds anyway." He acquiesced, however, and the bonds remained in Muncy. The Bucks made arrangements for Mr. Howard Ott at the Muncy Banking Company to aid Mr. Taylor in the clipping of his interest coupons.

A signature card was signed for the Muncy safe deposit box by Taylor and the defendant, purportedly effecting a joint tenancy with right of survivorship. The relevant portion of that contract entitled "Joint Tenancy-Agreement" and signed by Martha Buck and Charles Taylor in 1961 reads as follows:

> THE MUNCY BANKING COMPANY OF MUNCY, Muncy, Pa. is hereby authorized and instructed to permit access to said Box, by any (or either) of the undersigned and in the absence of the other (or either) to recognize such deputy or deputies as any (or either) of the undersigned may appoint as the deputy or deputies of all. *It is agreed that each (or either) of the undersigned is the owner of the present and future contents of said box, and that in the event of death of any (or either) of the undersigned, the survivor or survivors shall have the right to withdraw the contents.* * * * [Emphasis supplied]

A fair inference to be drawn from the record is that Taylor and Martha Buck both had keys to this box. Both parties had access to the box under the express terms of the agreement and Martha Buck did enter the box on December 1, 1964 and on March 1, 1965. There is nothing of record showing that Taylor ever entered the box.

The bonds remained in the safe deposit box in Muncy until December of 1964 at which time defendant removed them and took them to Charlottesville, Virginia. The alleged conversion is supposed to have occurred when defendant made this transfer.

When Taylor died in February 1965, his will, executed in 1960, appointed Martha Miller executrix. His will bequeathed twenty-five dollars to his brother's widow and eight thousand dollars to his nephew, George Taylor. The will devised and bequeathed to Martha Miller all of Taylor's personal and real estate, together "with Twenty Thousand Dollars ($20,000) in Government Bonds." The last clause of Taylor's will left the balance of his money to be divided among his six nieces and nephews. There is no evidence to show how much property was in Taylor's estate when he died.

Disputes over rights to the contents of safe-deposit boxes are certainly not foreign to the courts of our country. Though it is patent that safekeeping is the cardinal purpose of renting a safe-deposit box and that under such a view the arrangement is one of bailment, banks have through the years continued to draw agreements printed on signature cards in terms of landlord and tenant or lessor and lessee. A bank, of course, has no interest in creating or changing title to the effects of a safe-deposit box. Its paramount concern is in insulating itself from liability should any disputes arise over a box's contents.

The problem in ascertaining the right to the contents of a safe-deposit box has been made more complex by what one writer has called the imposition on the concurrent ownership of chattels of the "unsuitable trappings of land law." 14 A.L.R.2d 948, 951. "Annotation—Safe Deposit Box—Rights of Survivor" (1949). Nevertheless, where parties have by express and clear language applied words of joint-tenancy and survivorship to personalty kept in a safe-deposit box, courts have for the most part recognized these words as possessing their traditional meaning and, therefore, effecting a valid change in title. See, e. g., Kleemann v. Sheridan, 75 Ariz. 311, 256 P.2d 553 (1953); Duling v. Duling's Estate, 211 Miss. 465, 52 So.2d

39 (1951); see also cases cited in 14 A.L.R.2d 948, supra § 6, pp. 984–85.

In the present case defendant makes two separate arguments, either of which, if sustained, will prevent plaintiff's recovery. First, defendant contends that Taylor conveyed the bonds to defendant in an irrevocable *inter vivos* trust on May 18, 1956 and that therefore the bonds were not Taylor's property at the time of the alleged conversion in 1964. In the alternative, defendant contends that if there were no irrevocable *inter vivos* trust created in 1956, that Taylor conveyed joint ownership in the bonds with right of survivorship to defendant by executing a joint tenancy contract with her in 1961 for a safe-deposit box in which the bearer bonds were placed. For purposes of plaintiff's claim, argues defendant, it makes no difference whether this 1961 conveyance is treated as a gift absolute or in trust since the effect of either is to defeat plaintiff's claim.

Though defendant's first argument is both interesting and persuasive, I do not think it need be reached for, as defendant submits, in the alternative, even if Taylor did not effect an irrevocable *inter vivos* trust in 1956, his action in signing the joint tenancy agreement for the safe-deposit box in 1961 is sufficient, under Pennsylvania law, to defeat plaintiff's claim of conversion.

A look at the judicial decisions in Pennsylvania which control the merits of this diversity case reveals that, initially, the effect of the signing of a joint lease in a safe deposit box was not always clearly defined. The confusion which originally existed is analyzed and reviewed in the majority and dissenting opinions in Chadrow v. Kellman, 378 Pa. 237, 106 A.2d 594 (1954).

William Chadrow had rented a safe-deposit box in the Gimbel Brothers Bank and Trust Company of Philadelphia at which time two keys for the safe-deposit box were delivered to him by the bank. Access to the box was restricted to him. Mr. Chadrow informed his niece that he would take her to the bank and make her the joint owner of the contents of the safe-deposit box. Chadrow and his niece signed an agreement almost identical to the one in the instant case. It, too, was entitled "Joint Tenancy Agreement." It read as follows:

> Gimbel Brothers Bank and Trust Company is hereby authorized and instructed to permit access to the said box by any (or either) of the undersigned and to recognize such deputy or deputies as any (or either) of the undersigned may appoint as the deputy or deputies of all. It is agreed that each (or either) of the undersigned is the joint owner of the present and future contents of said box and that in the event of death of any (or either) of the undersigned, the survivors or survivor shall have the right to withdraw said contents, * * *

The majority opinion in *Chadrow* discussed the requisite delivery for making an *inter vivos* gift and in doing so made the following statement:

> We have repeatedly held that an essential element of an inter vivos gift is that there must be evidence of an intention to make a gift accompanied by *delivery, actual or constructive, of a nature sufficient not only to divest the donor of all dominion over the property, but to invest the donee with complete control.*

*Chadrow*, supra at 242, 106 A.2d at 597.

The court had this to say about safe-deposit boxes:

> * * * [I]n order to make a valid *inter vivos* gift of the contents of a safe deposit box there must be an actual delivery of the contents, or the delivery of a key to the box, to divest the donor of his dominion over the property and invest the donee with ownership, possession and control.

Id. at 244, 106 A.2d at 598.

The majority's conclusion was that since claimant in the *Chadrow* case never had access to the safe-deposit box, never had access to a key, the donor did not divest himself of dominion over the property claimed and did not invest

claimant with ownership, possession or control.

There was an extensive dissent by Justice Bell, who disagreed with the majority because, among other things, it applied the general principles of law with respect to ordinary *inter vivos* gifts to cases involving a jointly held safe-deposit box. Justice Bell said at p. 251, 106 A.2d at 601:

> While the general rule with respect to an ordinary *inter vivos* gift is well settled, the applicability of such rule to an *inter vivos* gift of *an interest* and especially of a *joint interest* in a bank account or in a safe deposit box or its contents has rarely, if ever, been carefully analyzed in this state; nor has the fundamental difference between such a gift and an ordinary gift been carefully considered. This is apparent from the majority opinion. How, for example, can a depositor or donor make *a valid delivery* in those cases in which he already has a bank account or a safe deposit box in his own name, and wishes to create in praesenti a *joint interest* and divest himself of *all* dominion over the subject of the gift? Contrary to the majority opinion, it is absolutely impossible to divest the donor of *all* dominion (and control) and invest the donee with *complete* dominion (and control) over a joint account or joint box or interest, and still have each party possess a joint dominion and control. There is little or no difficulty with respect to intention; but with respect to relinquishment of *all* dominion over a *joint* bank account or a *joint* safe deposit box, such a divestiture (and the investing of complete dominion in the donee) is, upon careful analysis, *a contradiction in terms and an impossibility.* Yet the majority assert that that is the proper test or rule in these cases. [Emphasis by Justice Bell]

From this point the dissent fashions what it calls a more appropriate and accurate yardstick for determining an *inter vivos* gift of a joint interest in a safe-deposit box. This rule would require the divestiture by the donor, not of all dominion and control over his interest in a safe-deposit box but merely the divestiture by donor and the investiture in the donee of so much dominion and control *as is consonant with a joint ownership,* title or interest in the subject matter of the gift. The dissent went on to conclude that under its modified rule for divestiture and under its view of the case as being a contract case, that Chadrow's niece, Jeannie Kellman, had become a joint owner immediately upon the signing of the joint tenancy agreement and therefore entitled to the contents of the safe-deposit box upon Chadrow's death.

The diverse opinions in the *Chadrow* case were soon to be unified. Two years after *Chadrow* was decided, the Supreme Court of Pennsylvania had the opportunity to decide another safe-deposit box case. By that time the court had decided that the requirements for making an effective *inter vivos* gift of a joint interest were, as Justice Bell had stated in *Chadrow,* somewhat different from the requirements for making an ordinary *inter vivos* gift. Complete divestiture by the donor was not considered requisite to a valid gift of a *joint* interest. The court said:

> To constitute a valid gift *inter vivos* of the contents of a safe deposit box, two essential elements are requisite. An intention to make an immediate gift, and such an actual or constructive delivery to the donee (a) as to divest the donor of all dominion and control, or (b) if a joint tenancy is created, as to invest in the donee so much dominion and control of the subject matter of the gift as is consonant with a joint ownership or interest therein.

In re King's Estate, 387 Pa. 119, 122, 126 A.2d 463, 465 (1956).

The court also pointed out that, though the burden of proof is normally upon claimant to prove the gift by clear and convincing evidence, when the owner of a safe-deposit box and his donee execute a contract or lease which recites that the property therein is the

joint property of the lessees, with right of survivorship, and recites that the lessees acknowledge the receipt of two keys to said box—this creates a *prima facie* case of a valid *inter vivos* gift of a joint interest (with right of survivorship) in said property. In re King's Estate, supra at 124, 126 A.2d at 465. Existence of such a contract, then, shifts the burden of proof to the party contesting the gift. Id. at 124, 126 A.2d 466.

The contract signed in *King's Estate* was very much like the one in the present case. King and his wife signed an agreement which read:

> *In case the Lessees are joint tenants* * * * all property of every kind at any time heretofore or hereafter placed in said box *is the joint property of both Lessees* and, *upon the death of either*, passes to the survivor * * *. [Emphasis by the court]

Id. at 121, 126 A.2d at 466.

When holding that the wife was entitled to the securities which had been in the box, the court obviously placed great probative weight on the donee's possession of a key to the box and her access to the contents.

While parol evidence is admissible in these cases (a) to prove an intention or lack of intention to make a gift, as well as (b) delivery or failure of delivery, because the instrument is considered to be incomplete or sometimes equivocal, it is established that the parol evidence which is necessary to disprove such a gift must be clear, precise and convincing. In re King's Estate, supra at 123, 126 A.2d at 465. There is no such evidence in the present case. On the contrary, the most favorable parol evidence I can find for plaintiff fails to show that Taylor did not intend to give the bonds to Martha Buck. Plaintiff's testimony is merely that decedent had said in regard to his will that he had "fixed things" for her (Martha Miller). Nothing in the records indicates that Martha Miller was not provided for by bonds or funds from Taylor's estate.

In the years following the decision in *King's Estate* the Supreme Court of Pennsylvania has continued to adhere to principles articulated in that case. See, e. g., In re Secary's Estate, 407 Pa. 162, 180 A.2d 572 (1962) where the alleged donee was refused recovery because she did not have access to the safe-deposit box. See also, In re Brozenic's Estate, infra.

Since it is beyond gainsay that in the present case decedent and defendant Martha Buck executed a joint tenancy contract essentially the same as the contracts executed in In re King's Estate, supra, and In re Secary's Estate, supra, this court has no choice but to presume that such a contract has created a valid *inter vivos* gift of a joint interest. A *prima facie* case of a valid *inter vivos* gift was created when decedent and Martha Buck signed the joint tenancy agreement. If plaintiff fails to meet her burden of proof and rebut the presumptin of this gift by showing want of intention or failure of delivery, she cannot prevail in this action for conversion. A person having a joint ownership in the contents of a safe-deposit box is not guilty of conversion when she withdraws those contents. Furthermore, though the present decision in favor of defendant Buck does not rest on this conclusion, even if a court were to hold that Martha Buck were guilty of a technical conversion in 1964 in spite of her joint interest in the bonds, the damages suffered from the conversion by Taylor's estate would have been nominal. Because of her survivorship rights, Martha Buck would have become the sole owner of the bonds the moment Taylor died. His estate would never have had the benefit of ownership of the bonds. See Stevenson v. Economy Bank of Ambridge, 413 Pa. 442, 197 A.2d 721, 726, 4 A.L.R.3d 1450 (1964) where the court awarded a judgment for one dollar after finding that though there had been a conversion, there was no basis for real, special or other compensatory damages.

The principal thrust of plaintiff's argument in her attempt to show lack of

intent or a failure of delivery is not easily discerned. Her memorandum merely lists several cases under the heading "Cases of Law." Each of these cited cases is followed by a brief sentence or two stating plaintiff's version of what the case holds. The cases listed by plaintiff dealing primarily with an alleged donor's intention to make a gift are In re Berdar's Estate, 404 Pa. 93, 170 A.2d 861 (1961); In re Secary's Estate, 407 Pa. 162, 180 A.2d 572 (1962); and In re Brozenic's Estate, 416 Pa. 204, 204 A.2d 918 (1964). None of these rebuts the presumption that Taylor effected a valid *inter vivos* gift of the bonds when he signed the joint tenancy agreement in 1961.

In re Berdar's Estate, supra, as defendant points out, is clearly distinguishable from the case at bar. The court held that the signing of a signature card for a joint savings account did not effect an *inter vivos* gift because the contract was patently ambiguous and because the evidence showed that decedent, who immigrated to this country in 1913, had been deaf, illiterate and ill at the time of the signing. He could not read or write and had great difficulty in understanding the English language. Under the circumstances, the court found that he clearly did not intend to give claimant a beneficial interest. Not only is the contract in the instant case clear and unambiguous but there is no persuasive evidence indicating that decedent Taylor for reasons of age, illiteracy, or any other infirmity was not aware of what he was doing.

In re Secary's Estate is more favorable to defendant than to plaintiff. Admittedly, the court found that Secary's Estate should prevail against the claimant of an *inter vivos* gift of the contents of a safe-deposit box *but* its reasoning was based on the fact that the decedent had been the only one with ready access to the box. Decedent Secary had entered the box 33 times the last eight years of his life. The claimant had not entered the box once during this period. Moreover, the decedent had possessed *both* keys to the box. The Secary situation must be contrasted with evidence in the present record. Taylor did not enter the safe-deposit box in Muncy, Pennsylvania even once. Martha Buck entered it at least twice. Though Taylor may have had one key, there is no evidence that he had both keys. Martha Buck must have had a key as she certainly had ready access to the box. Obviously, she would have been unable to move the bonds to Charlottesville without such access.

In re Brozenic's Estate, supra, merely reviews the rules governing *inter vivos* gifts established earlier by the Supreme Court of Pennsylvania in In re King's Estate, supra, and restated in In re Secary's Estate, supra. Like the *Secary* case, its holding is more favorable to Martha Buck than to plaintiff. In *Brozenic* decedent had been the sole owner of a savings account. He forwarded a signature card to Anna Jarmek for her signature. The card read in part: "The undersigned hereby apply for a savings account * * * in the joint names of the undersigned as joint tenants with the right of survivorship." The court held the delivery of this card to the Loan Association with both signatures attached made out a *prima facie* gift. This presumption was not rebutted, even by a showing that decedent during his lifetime had retained possession of a passbook which purportedly had to accompany "all transactions." The two additional claimants in this case who lost were unable to prevail because they could not produce a signature card or a contract signed by both donor and donee.

Finally, plaintiff cites In re Peoples First National Bank & Trust Company v. Ratajski, 399 Pa. 419, 160 A.2d 451 (1960) presumably in support of the implicit argument that the burden of proof in the instant case is shifted to defendant, recipient of Taylor's gift, because a "confidential relationship" existed between the two parties. As the record now stands, it will not support a factual finding that such a relationship did exist between Taylor and Martha Buck. Decedent Ratajski had been in what the

court described as poor health. He also had difficulty with English. He was an immigrant. The claimant of the gift had gone to live with Ratajski, had kept house, had worked for him and had acted as his secretary. Decedent had, during that time, developed the *habit* of signing papers in blank, without reading them. Certainly the relationship between Taylor and defendant is significantly different from the "confidential relationship" in the *Ratajski* case.

Applying the principles established by the foregoing Pennsylvania decisions, I have no doubt that as the record stands plaintiff has failed to rebut the presumption that an *inter vivos* gift was created in 1961 when decedent Taylor and defendant Martha Buck signed the joint tenancy agreement. Accordingly, I find for the defendant.

It is requested that prevailing counsel prepare a final order, submit it to counsel for plaintiff for approval as to form and then, with four copies, to the court for entry.