Helena Lemp DUGGAN, et
al., Appellants,

v.

George J. KETO, Personal Representative of the Estate of Mary Eileen
Lemp, Appellee.

Helena Lemp DUGGAN, et
al., Appellants,

v.

Arthur PETER, Jr., et al., Appellees.

Nos. 86–352, 86–727 and 86–1274.

District of Columbia Court of Appeals.

Argued Oct. 13, 1987.
Decided Feb. 28, 1989.
As Amended March 28, 1989.

Edward Greensfelder, Jr., with whom Gerald P. Greiman, Washington, D.C., was on the brief, for appellants.

Thomas B. Carr, Washington, D.C., for appellee Keto.

Harlan L. Weiss, with whom Sidney S. Sachs, Washington, D.C., was on the brief, for appellees Peter, et al.

Before ROGERS, Chief Judge,[*] TERRY, Associate Judge, and PRYOR, Senior Judge.[**]

TERRY, Associate Judge:

Mary Lemp died on October 2, 1981, leaving the bulk of an estate worth over $1.1 million to her brother, William Stroman, rather than to her stepchildren, James Lemp, Helena Lemp, and John Lemp, Jr. The stepchildren had expected to be the primary beneficiaries under Mary Lemp's will and so brought suit against her estate, alleging that Mary[1] had breached a reciprocal wills agreement which she had made with their late father. The estate filed a counterclaim against James Lemp when it learned that he had removed several bonds from Mary's safe deposit box shortly after her death. The trial court granted summary judgment in favor of the estate on both the original claim and the counterclaim.

In a related action, the stepchildren sued Arthur Peter, Jr., and the partners in his law firm, Hamel & Park, for malpractice and breach of fiduciary duty. Mr. Peter had drafted wills for Mary Lemp and her husband, Colonel John Lemp. The trial court granted summary judgment for the defendants on these claims as well. The stepchildren now appeal from all the awards of summary judgment and from an order authorizing the estate to pay $222,261 in attorney's fees.

## I. FACTUAL BACKGROUND

### A. *The Claim against the Estate*

Appellants are the children of Colonel John Lemp and Helena Lemp. John divorced Helena in 1957 and married Mary Lemp. Mary never bore any children.

In May 1973, John and Mary Lemp consulted Arthur Peter, Jr., a member of the law firm of Hamel & Park, about drafting a will for each of them. After discussing their assets and testamentary goals, Mr. Peter wrote separate wills for the Lemps; the terms of the wills, however, were largely reciprocal. Colonel Lemp bequeathed his residuary estate to Mary if she survived him for thirty days. If she did not survive him, his estate would go to his three children (appellants), except for certain property in Texas, which would be left to Mary's brother and sister, William Stroman and Gusta Mae Brewton. Similarly, Mary bequeathed her residuary estate to John should he survive her by thirty days, and, if not, then to appellants except for the property in Texas left to her brother and sister.

Despite their overall similarity, neither will referred to the other, and some provisions in the two wills differed. Mr. Peter

---

[*] Judge Rogers was an Associate Judge of the court at the time of argument. Her status changed to Chief Judge on November 1, 1988.

[**] Judge Pryor was the Chief Judge of the court at the time of argument. His status changed to Senior Judge on November 2, 1988.

1. Because several of the principal parties share the same last name, we shall generally refer to

testified [2] that he had no knowledge of any agreement between the Lemps to make the wills irrevocable. James Lemp testified, however, that his father had told him that his property would eventually descend to his three children.

Colonel Lemp died on October 25, 1974. Three days before his death, he executed a new will which left his entire estate to his wife Mary, except for some small bequests to his children of personal items, stock which had only a nominal value, and a few thousand dollars in life insurance proceeds. Mary, however, elected not to receive anything under the will. *See* D.C.Code § 19–113(a) (1973).[3] With the exception of a bank account containing $211.71, Colonel Lemp and his wife had owned all their property jointly, so that she became the sole owner of everything after his death. Mary therefore had the colonel's estate administered as a small estate [4] and received the money in the bank account as her statutory allowance under D.C.Code § 19–101(a) (1973).

After her husband's death, Mary Lemp executed three new wills on November 22, 1974, October 25, 1978, and November 7, 1979. Although the 1974 will has never been produced, the 1978 and 1979 wills were substantially different from Mary's original 1973 will, leaving the bulk of her estate to her own relatives rather than to her stepchildren.

Mary Lemp died on October 2, 1981, leaving an estate valued at $1,126,673.11. Although her will (the 1979 will) bequeathed some property, worth about $208,000, to her three stepchildren, the lion's share of her estate, valued at almost $920,000, went to her own relatives, primarily to her brother William Stroman, the residuary legatee. Appellants thereafter filed suit against George Keto, as personal representative of Mary's estate, alleging that John and Mary Lemp had entered into an agreement not to revoke their 1973 wills and that Mary had breached that agreement. They sought damages for that alleged breach or, alternatively, specific performance of it. As a third alternative, appellants claimed that John and Mary had formed a trust for their benefit.

During discovery, appellants moved to compel Hamel & Park to disclose certain communications made by John and Mary Lemp with the firm. Hamel & Park opposed the motion, asserting Mary's attorney-client privilege. Judge Pratt ruled that the privilege did not apply to those communications made by the Lemps when they sought joint counsel. However, he upheld the claim of privilege as to those communications which Mary made both in her capacity as personal representative of her husband's estate and with regard to her own affairs.

Judge Pratt initially denied the estate's motion for summary judgment on appellants' claims, but without prejudice. After further filings, the estate moved again for summary judgment, which was granted by Judge Barnes.

### B. *The Estate's Counterclaim*

A few hours after Mary's death on October 2, 1981, James Lemp went to a branch of the First American Bank on Wisconsin Avenue, N.W., and removed eleven bearer bonds from a safe deposit box which he

---

them throughout this opinion by their first names.

**2.** Any mention of testimony in the course of this opinion refers to the deposition testimony of various witnesses. There was, of course, no trial on the merits, since both cases were decided on motions for summary judgment.

**3.** Because Colonel Lemp died in 1974, the administration of his estate was governed by pertinent provisions of the 1973 edition of the District of Columbia Code. *See* Pub.L. No. 89–183, § 7, 79 Stat. 685, 780 (1965). Our probate code was extensively revised by the Probate Reform

Act of 1980, which took effect January 1, 1981, and applies to the estates of all persons who died on or after that date. D.C.Code § 20–109 (1981); *see Richardson v. Green,* 528 A.2d 429, 430 n. 1 (D.C.1987).

**4.** In the District of Columbia, any estate below a certain size may be designated as a "small estate." If this is done, and if certain other requirements are met, the administration of the estate is simplified and abbreviated. *See* D.C. Code §§ 20–2101 through 20–2108 (1973). The corresponding provisions of the current code are D.C.Code §§ 20–351 through 20–357 (1981).

held jointly with Mary. These bonds had a face value of $55,000. James did not tell the bank officials about his stepmother's death, nor did he tell anyone about his taking the bonds until December 1983. The estate first learned about the removal of the bonds during discovery proceedings in August 1984, and shortly thereafter it filed a counterclaim against James for conversion.

James claimed as a defense that he and his wife Susan had received the bonds as a gift from Mary before her death or, alternatively, that they were the subject of an informal *inter vivos* trust under which title to the bonds had vested in James and his wife upon Mary's death. In support of this claim, James produced a letter from Mary dated February 25, 1976, which he offered as proof of her donative intent. The letter stated in part:

> Enclosed is the form, Jim, to sign where the "X" is in both places. Although this form states that both of us will be responsible for the rent, etc., I'm writing a letter to accompany it saying that I alone am responsible. Today I put a rubber band around those papers with a small tan envelope on top, and this is what you are [to] remove, if and when it looks as if my time here is ending, for safe keeping for you and Susan.

The form mentioned in the letter was a lease for safe deposit box No. 692 in the main office of the First American Bank on 15th Street, N.W., in downtown Washington. In July 1979 Mary moved the contents of this box to another one located in the Wisconsin Avenue branch of the First American Bank. Mary and James were joint lessees of both boxes.

James testified that Mary gave him a key to the new box in 1979. Additionally, James said that on August 13, 1979, Mary took him to the Wisconsin Avenue branch, where together they opened the box and Mary pointed to the packet of papers to which she had referred in her letter. Although he did not unwrap the packet, James could see that it contained municipal bonds.

The trial court noted in its opinion that only four of the eleven bonds in the packet were purchased before the date of the letter, February 25, 1976, implying that Mary could not have referred to the remaining seven in her letter. The court also observed that all matured coupons except the most recent one on each bond had been removed and redeemed before James took the bonds from the safe deposit box, and that James had stated he never used the box as his own. The court then granted the estate's motion for summary judgment on the counterclaim.

The parties were in further disagreement about the proper calculation of damages. Generally adopting the formula proposed by the estate, the court awarded damages for the present market value of the six bonds still in James' possession, the coupon interest that he had received, the proceeds from the sale of the other five bonds, and pre-judgment interest at eight percent per annum on the sale proceeds and coupon interest. Appellants contend on appeal that both the award of summary judgment and the measurement of damages were erroneous.

The trial court also authorized Mr. Keto, the personal representative, to pay $222,-261.00 from the estate's assets for attorney's fees and other costs resulting from the litigation of appellants' claims against the estate. In making this award, the court noted that it constituted only a partial payment (Mr. Keto had petitioned for over $360,000). Appellants now challenge the award as excessive and premature.

### C. *The Malpractice and Breach of Fiduciary Duty Claims*

By 1978 John Lemp, Jr., noticed that his stepmother's attitude toward her stepchildren had begun to change, and he suspected that she might have done something with the property she had inherited from her late husband. John decided to investigate. On July 3, 1979, he went to the Superior Court to review the records pertaining to his father's estate. What he discovered aroused his suspicions even further. First, his father's signature on the will did not look authentic, and the will had

been executed at a time when his father was gravely ill and, in John's view, his testamentary capacity was doubtful. Further, the will did not even mention any of Colonel Lemp's three children, nor did it dispose of various personal items mentioned in his previous will. Finally, John discovered that, despite his father's wealth, the estate had been handled as a small estate. John discussed his misgivings with an attorney standing nearby, who coincidentally had some recollection of the small-estate proceedings. The attorney remarked that John would have to take legal action if he wanted to question the administration of his father's estate.

Despite John's doubts, which he shared with his brother and sister, about Mary's inheritance of all the Colonel's estate, the stepchildren chose not to challenge Mary while she was alive. Because they fully expected to receive their father's estate by bequest from Mary, they did not perceive Mary's possible wrongdoing as detrimental to their interests. Consequently, they did not file any malpractice action until after Mary died, when they discovered to their astonishment that she had left the bulk of what she had inherited from the Colonel to her own relatives.

Appellants' claim against Mr. Peter and his law firm was in two parts. First, they alleged that Mr. Peter had committed malpractice in 1973 by negligently failing to explore means by which they would receive most of the Colonel's assets. Second, they claimed that Hamel & Park had breached their fiduciary duty to the Colonel and to them, his children and the natural objects of his bounty, by preparing two subsequent

wills for Mary which substantially disinherited them.[5]

The trial court ruled that both the malpractice claim and the breach of fiduciary duty claim were barred by the statute of limitations. The court reasoned that the statute began to run as to each claim upon John's review of his father's will in July 1979, and accordingly it granted summary judgment for Mr. Peter and Hamel & Park. Appellants appeal from this ruling as well.

## II. STANDARD OF REVIEW

Summary judgment is appropriate only when the pleadings and other material before the court "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Super.Ct.Civ.R. 56(c). "In reviewing on appeal the propriety of a summary judgment, this court must determine whether there is any unresolved issue of fact relevant to the ruling and also whether the trial court correctly applied the substantive law.... In carrying out that task, we must view the record in the light most favorable to the party who opposes summary judgment and thus resolve any doubt as to the existence of a factual dispute against the moving party." *Davis v. Gulf Oil Corp.*, 485 A.2d 160, 164 (D.C. 1984) (citations omitted); *accord, e.g., Swann v. Waldman*, 465 A.2d 844, 846 (D.C.1983) (citing cases).

■ Applying this standard of review, we affirm the trial court's grant of summary judgment in the litigation involving the estate, both as to the stepchildren's claim against the estate and as to the estate's counterclaim against James Lemp.[6] We

---

5. Mary's 1974 and 1978 wills were drafted by Hamel & Park attorneys. Her 1979 will was drafted by Mr. Keto, who is with a different firm.

6. In light of Judge Pratt's original ruling, appellants make a preliminary argument that Judge Barnes' subsequent award of summary judgment was contrary to the law of the case. "The law of the case doctrine bars a trial court from reconsidering a question of law that was already decided in the same case by another court of coordinate jurisdiction." *Kaplan v. Pointer*, 501 A.2d 1269, 1270 (D.C.1985) (citation omitted); *accord, Ehrenhaft v. Malcolm Price, Inc.*, 483

A.2d 1192, 1196 (D.C.1984). The doctrine is applicable when "(1) the motion under consideration is substantially similar to the one already raised before, and considered by, the first court; (2) the first court's ruling is 'sufficiently "final" '; and (3) the prior ruling is not 'clearly erroneous in light of newly presented facts or a change in substantive law.' " *P.P.P. Productions, Inc. v. W & L, Inc.*, 418 A.2d 151, 152 (1980) (citation omitted).

This three-part test is not met here. Judge Pratt initially denied summary judgment because he could not determine from the evidence before him that there were no material facts in

also affirm the trial court's application of the attorney-client privilege to shield Mary Lemp's communications concerning both her role as representative of her husband's estate and her own personal affairs. We conclude, however, that the court's calculation of damages for conversion was partially in error, and thus we remand the case for a proper computation of damages. The proceedings on remand must also include a recalculation of the award of attorney's fees.

With respect to the action against Mr. Peter and his law firm, we hold that the trial court erred in ruling that the statute of limitations barred appellants' malpractice and breach of fiduciary duty claims. We therefore reverse the award of summary judgment on those claims and remand the case for further proceedings.

### III. THE CLAIM AGAINST THE ESTATE

#### A. *Irrevocable Mutual Wills*

Appellants first maintain that John and Mary Lemp entered into an oral contract not to revoke their 1973 wills. There can be no doubt that the two instruments are mutual wills, separate instruments containing reciprocal or substantially similar terms. 1 W. BOWE & D. PARKER, PAGE ON THE LAW OF WILLS § 11.1, at 553 (1960) (hereinafter PAGE ON WILLS). But that does not mean that they were irrevocable. The mere fact that mutual wills exist is insufficient proof of an accompanying contract not to revoke. *Coveney v. Conlin,* 20 App.D.C. 303, 329. (1902); *accord, e.g.,* 1 PAGE ON WILLS, *supra,* § 11.1, at 554. To prove that the mutual

wills were made irrevocable by an oral or written contract, District of Columbia law requires that such a contract "be complete, definite in its terms, and proved with clearness and certainty." *Coveney v. Conlin, supra,* 20 App.D.C. at 328 (citations omitted).

Acknowledging that this is the law, appellants contend that the evidence necessary to prove a contract may be found in the circumstances surrounding the execution of the mutual wills. Specifically, appellants claim that the purpose of the mutual wills was to provide first for the surviving spouse and then for Colonel Lemp's children. The Lemps stated this twofold intention to Mr. Peter, who drafted the wills, and Colonel Lemp later repeated it to his son James. Appellants reason that, in order to ensure that their goals would be realized, their father and stepmother must have entered into an agreement to make the wills irrevocable.

 We cannot agree. Although this evidence may be persuasive to prove a common testamentary scheme, it does not establish the existence of a contract. The court in *Coveney v. Conlin, supra,* did not state exactly what kind of evidence would be sufficient to prove an agreement not to revoke, but it did make clear that evidence of a common testamentary scheme was insufficient. 20 App.D.C. at 329.[7] Most courts which have been directly faced with the issue have required some independent evidence that the testator actually entered into a contract. *E.g., In re Estate of Moore,* 137 Ariz. 176, 179, 669 P.2d 609, 612 (1983); *Woll v. Dugas,* 104 N.J.Super. 586,

---

dispute. Judge Barnes, however, had additional evidence before her, obtained through discovery, which enabled her to determine that summary judgment was appropriate. Thus the two motions were not substantially similar, and this case is distinguishable from both *Kaplan* and *Ehrenhaft,* in which the movants did not present new pertinent facts to the second judge. Moreover, the record makes clear that Judge Pratt never intended his denial of the motion to be final; on the contrary, he recognized that it would be premature to make a dispositive ruling because he had not been given enough facts on which to do so.

7. The *Coveney* court, in reaching its decision, adopted the reasoning of a New York case, *Edson v. Parsons,* 155 N.Y. 555, 50 N.E. 265 (1898), which held that evidence of a common testamentary scheme was insufficient to prove a contract not to revoke. *Edson* was later relied upon by the New York Court of Appeals when it held in *Oursler v. Armstrong,* 10 N.Y.2d 385, 179 N.E.2d 489, 223 N.Y.S.2d 477 (1961), that a finding of irrevocability must be based on proof of an express promise by the testator or testatrix not to revoke a will. The court ruled in *Oursler* that evidence which merely reiterated the testatrix's intention as expressed in the will itself was insufficient.

602, 250 A.2d 775, 783–784 (1969), *aff'd,* 112 N.J.Super. 366, 271 A.2d 443 (1970); *Oursler v. Armstrong,* 10 N.Y.2d 385, 389, 179 N.E.2d 489, 490, 223 N.Y.S.2d 477, 479 (1961); *see also Notten v. Mensing,* 20 Cal.App.2d 694, 696, 67 P.2d 734, 735 (1937); *Neipp v. Toolen,* 313 Ill.App. 28, 31–32, 38 N.E.2d 980, 981–982 (1942); *Neff v. Poboisk,* 281 Minn. 475, 476–78, 161 N.W.2d 823, 824–825 (1968); *Willbanks v. Goodwin,* 300 Or. 181, 202, 709 P.2d 213, 225 (1985); *Fanning v. Fanning,* 111 R.I. 116, 119–20, 302 A.2d 299, 301 (1973); *Kirk v. Beard,* 162 Tex. 144, 152–53, 345 S.W.2d 267, 272 (1961).[8]

Appellants have presented no evidence of an agreement to make irrevocable wills; indeed, Mr. Peter, the draftsman of the wills, testified that the Lemps did not make such an agreement. In *Oursler v. Armstrong, supra,* 10 N.Y.2d at 392–393, 179 N.E.2d at 492, 223 N.Y.S.2d at 482, similar testimony from the drafting attorney helped to persuade the court that evidence of an agreement was lacking. In this case all that appellants have proven is that their father and stepmother executed mutual wills and intended common testamentary goals. This evidence, in our view, is legally insufficient to prove the existence of a contract not to revoke either will. Viewed in the light most favorable to appellants, the evidence shows nothing more than that "the reciprocity or similarity in the dispositive provisions of the two wills results from similar tastes and affections that have resulted from years of living together, and [that] the making of identical or similar wills was a spontaneous thing unaccompanied by even so much as a thought on the part of either husband or wife that they should enter into a contract with each other." 1 PAGE ON WILLS, *supra,* § 11.1, at 554.

---

**8.** *But see Halper v. Froula,* 148 Cal.App.3d 1000, 1004, 196 Cal.Rptr. 727, 729–730 (1983); *Lawrence v. Ashba,* 115 Ind.App. 485, 490–92, 59 N.Ed.2d 568, 570–571 (1945); *Shaka v. Shaka,* 120 N.H. 780, 782–83, 424 A.2d 802, 803–804 (1980); *Shook v. Bell,* 599 P.2d 1320, 1324–1325 (Wyo.1979).

Although the Uniform Probate Code has not been adopted in the District of Columbia, we

### B. *Oral or Constructive Trust*

Alternatively, appellants claim that they have raised a triable issue of fact on their right to their stepmother's estate under the principles governing oral or constructive trusts. We reject this argument for essentially the same reason that we have rejected their claim of irrevocable mutual wills, namely, that the record contains no evidence of any intent on the part of either John or Mary Lemp to create a trust or of a promise to make any particular disposition of their property.

The elements of a trust include a trustee, who holds the trust property and is subject to equitable duties to deal with it for the benefit of another; a beneficiary, to whom the trustee owes such duties; and the trust property, which is held by the trustee for the beneficiary. *Cabaniss v. Cabaniss,* 464 A.2d 87, 91 (D.C.1983). Additionally, there must be proof of the settlor's intention to create a trust, which may be manifested "by written or spoken language or by conduct, in light of all surrounding circumstances." *Id.* (citations omitted).

On the element of intent, courts are properly hesitant to create implied testamentary trusts, *i.e.,* trusts which are not readily apparent from the face of the will. 5 PAGE ON WILLS, *supra,* § 40.9, at 128–129. Moreover, "oral instructions should not be used to show that a gift is in trust, and a number of courts have reached this result, even if the will refers expressly to such oral instructions and attempts to incorporate them." *Id.* § 40.11, at 130–131 (footnotes omitted). The test for proving an intent to create a testamentary trust from oral evidence is essentially the same as that for proving an oral agreement not to revoke reciprocal wills: clear and convincing evidence of a promise to dispose of assets by testamentary disposition in favor

---

note that the Code imposes strict standards for proving a contract not to revoke a will. Such a contract can be established only by "(1) provisions of a will stating material provisions of the contract; (2) an express reference in a will to a contract and extrinsic evidence proving the terms of the contract; or (3) a writing signed by the decedent evidencing the contract." UNIF. PROBATE CODE § 2–701, 8 U.L.A. 155 (1983).

of one or more specific beneficiaries. *See Levin v. Smith,* 513 A.2d 1292, 1296 (Del. 1986); *Dougherty v. Dougherty,* 175 Md. 441, 447–50, 2 A.2d 433, 436 (1938); *In re Irrevocable Inter Vivos Trust Agreement of Hanley,* 307 Pa.Super. 153, 175–76, 452 A.2d 1360, 1371 (1982) (Johnson, J., dissenting), *aff'd sub nom. Siebert v. Bird,* 503 Pa. 119, 468 A.2d 1093 (1983).

 Thus appellants' assertion of an oral trust must fail. Neither Colonel Lemp's will nor Mary's will provides for the creation of a trust, and there is no other evidence that either of them ever intended to create a trust for appellants' benefit. Indeed, appellants have failed to prove even that the Colonel and Mary had an oral agreement for the survivor of them to hold the estate, or any part of it, in trust for anyone.[9]

 Appellants' argument that the court should establish a constructive trust is also without merit. A constructive trust is fundamentally a remedy to prevent unjust enrichment. D. DOBBS, HANDBOOK ON THE LAW OF REMEDIES § 4.3, at 246 (1973) (hereinafter DOBBS ON REMEDIES). When someone is lawfully entitled to possession of certain property, there is no reason to impose a constructive trust on that property for the benefit of someone else. *See, e.g., Oursler v. Armstrong, supra,* 10 N.Y.2d at 391, 179 N.E.2d at 491, 223 N.Y.S.2d at 480. Mary received no benefits under the Colonel's will because she was already the joint owner of almost all the property at issue. She was fully entitled to all of that property, as well as her statutory allowance. *See Willbanks v. Goodwin, supra,* 300 Or. at 199–200, 709 P.2d at 223–224. Therefore, Mary was not unjustly enriched, and a constructive trust is not warranted.

## IV. THE ESTATE'S COUNTERCLAIM

Mary's estate filed a counterclaim against James Lemp, alleging that he had converted eleven bearer bonds by removing them from the safe deposit box a few hours after Mary's death. James asserted that these bonds were an *inter vivos* gift from Mary, or, in the alternative, that they were the corpus of a trust of which he was the beneficiary. The trial court ruled that James was liable for conversion. We affirm this ruling because James has not presented sufficient evidence to raise a material issue of fact under either of the two theories on which he bases his claim of entitlement to the bonds.

### A. *Inter Vivos Gift*

 "The requisites of a valid gift *inter vivos* are delivery, intention on the part of the donor to make a gift, and absolute disposition of the subject of the gift." *Murray v. Gadsden,* 91 U.S.App.D.C. 38, 49, 197 F.2d 194, 205 (1952) (citations omitted). The evidence must show that the gift took effect immediately; a gift intended to take effect in the future is not an *inter vivos* gift. *Lust v. Miller,* 55 App.D.C. 217, 219, 4 F.2d 293, 295 (1925); 38 AM. JUR.2D *Gifts* §§ 18, 81 (1968). If the donor retains the right to receive income for life, the *inter vivos* gift is not necessarily invalidated. But such a retention may become a decisive factor if there are other factors which tend to negate a finding of absolute disposition. *Id.* § 26.

 The burden of proving that a transfer was an *inter vivos* gift falls upon the person asserting the gift, in this instance James Lemp. Because his allegation of an *inter vivos* gift followed the death of the alleged donor, James must prove the gift by clear and convincing evidence. *Estate of Presgrave v. Stephens,* 529 A.2d 274, 280 (D.C.1987); *Davis v. Altmann,* 492 A.2d 884, 885 (D.C.1985).

We agree that James Lemp at least raised a factual issue as to whether his stepmother intended to make an *inter vi-*

---

**9.** Appellants maintain that, even if there was insufficient evidence of an express trust for Mary's entire estate, there was at least enough to prove an express trust for the fourteen bearer bonds found in a wall safe in Mary's apartment after her death and included among the assets of her estate. This argument must fail for the same reason, namely, the lack of any evidence of an intent on Mary's part to create either a testamentary or an *inter vivos* trust with respect to these bonds.

*vos* gift or a future gift. The letter of February 25, 1976, quoted at 1130, *supra*, is ambiguous on this question. It does not refer specifically to the bearer bonds, most of which did not even exist at the time Mary wrote the letter, nor does it explain what Mary meant by "safe keeping." It does appear that James was not to remove the papers from the box until Mary's death was imminent ("when it looks as if my time here is ending"). On the other hand, Mary placed the bonds in a safe deposit box that she leased jointly with James, and James testified that Mary opened the box and showed him a bundle containing some municipal bonds, telling him that they were his. Mary may very well have intended to make an *inter vivos* gift at that moment, retaining only a right to the interest payments during her lifetime.

■ We need not rule on the issue of intent, however, for it is clear from the undisputed evidence that there was neither delivery nor absolute disposition, and for that reason the estate was entitled to summary judgment on its counterclaim. Mary kept a key to the safe deposit box and continued to have access to the bonds throughout her lifetime, clipping the coupons from them for her own benefit. Hence she never made an absolute disposition of the bonds. Likewise, James did not produce sufficient evidence of delivery to raise a triable issue of fact. An *inter vivos* gift can be made by either actual delivery (physically handing over the chattel) or constructive delivery (handling over some type of formal instrument purporting to pass title to the donee). *See* 38 AM.JUR.2D *Gifts* §§ 20, 32 (1968). The evidence here shows neither.

■ James argues that Mary made actual delivery by placing the bonds in the safe deposit box which she leased jointly with him. Case law in this and other jurisdictions, however, requires that donor part with all dominion and control of the property to effect actual delivery. *Casey v. Topliffe*, 65 App.D.C. 100, 101, 80 F.2d 543, 544 (1935) (no *inter vivos* gift of bonds because alleged donor, although an invalid, retained key to safe deposit box containing

the bonds); *Lee v. Lee*, 55 App.D.C. 344, 345, 5 F.2d 767, 768 (1925) (no gift of property in trunk because alleged donor retained right to remove trunk's contents); *see also Murray v. Gadsden, supra*, 91 U.S.App.D.C. at 49, 197 F.2d at 205 (no gift because alleged donor retained control over joint savings account); Annotation, *Joint Lease of Safe–Deposit Box as Evidence in Support or Denial of Gift Inter Vivos of Contents Thereof*, 40 A.L.R.3D 462, 465 (1971); Annotation, *Necessity of Delivery of Stock Certificate to Complete Valid Gift of Stock*, 23 A.L.R.2D 1171, 1184 (1952). Because she had continued access to the bonds and clipped coupons for her own benefit, Mary did not part with dominion and control of the property; hence there was no actual delivery. *Casey v. Topliffe, supra*, is dispositive on this point.

■ The record also fails to support James' theory that Mary constructively delivered the bonds by sending him the February 25 letter. A written instrument may be used to effect delivery of personal property in some cases. *E.g., Smith v. Acorn*, 32 A.2d 252, 254 (D.C.1943) (automobile effectively delivered when donee received certificate of title even though donor retained possession); *see* 38 AM.JUR.2D *Gifts* § 32 (1968). But the letter written by Mary does not contain the necessary formalities, such as those found in a certificate of title or a bill of sale, to effect constructive delivery of the bonds. Unless physical delivery is impossible or impracticable, an informal writing is generally deemed insufficient to prove a valid gift. *See id.* § 33.

James relies on *Conlon v. Turley*, 56 App.D.C. 95, 10 F.2d 890 (1926), in which the court found constructive delivery of some bonds even though the donor had retained access to them and continued to collect the interest. The donor in *Conlon* told a bank official to place the bonds "in safe-keeping for my daughter, and I want a receipt made out in her name." The official prepared and signed such a receipt on bank stationery, which the father then handed to the daughter. Thereafter she placed the receipt in her father's safe, and

the father continued to collect the interest on the bonds, which the bank held as bailee, until his death. The court held that the written receipt, coupled with "the repeated declarations of the donor that he had given the bonds to the donee," were sufficient to prove a gift. *Id.* at 97, 10 F.2d at 892. Mary Lemp's letter of February 25 has none of the formal attributes of the bank receipt, nor is there anything in this case comparable to "the repeated declarations of the donor" in *Conlon.* Moreover, Mary's letter was, at best, ambiguous as to what property she intended for "safe keeping" when her death became imminent. Finding *Conlon* readily distinguishable, we hold that the February 25 letter is insufficient on its face even to raise a factual issue of constructive delivery.[10]

Thus we conclude that the evidence before the trial court failed to raise a material issue of fact as to absolute disposition and delivery, two of the three elements necessary to prove an *inter vivos* gift. Accordingly, we affirm the trial court's grant of summary judgment to the estate on its counterclaim.

### B. *Express Trust*

Alternatively, James contends that he rightfully acquired the bonds as the beneficiary of a trust created by Mary. We hold that the trial court properly awarded summary judgment for the estate on this issue as well.

In *Cabaniss v. Cabaniss, supra,* 464 A.2d at 91–92, this court reiterated the requirements for proving a valid trust. There must, of course, be a trustee, a beneficiary, and trust property. Most important for this case is the requirement that the settlor manifest his or her intention to create a trust. That intention may be proved either by words or by conduct, which must be considered in light of all the surrounding circumstances. "No particular form of words or conduct is necessary to manifest an intention to create a trust." *Id.* at 91 (citations omitted). Rather, the courts will look to several "evidentiary factors" in determining that intent:

(1) the imperative, as distinguished from precatory, nature of the words used by the settlor to create a trust; (2) the definiteness of the trust property; (3) the certainty of the identity of the trust beneficiaries; (4) the relationship between and financial position of the parties; (5) the motives which may reasonably be supposed to have influenced the settlor in making the disposition; and (6) whether the result reached in construing the transaction as a trust would be such as a person in the situation of the settlor would naturally desire to produce.

*Id.* at 92 (citations omitted). Finally, as is the case with gifts, the settlor of a trust may reserve the right to receive income from the trust property for life, thereby postponing the beneficiary's enjoyment. 1 A. SCOTT & W. FRATCHER, THE LAW OF TRUSTS § 26.1, at 293 (4th ed. 1987) (hereinafter SCOTT ON TRUSTS).

In *Moore v. Layton,* 147 Md. 244, 127 A. 756 (1925), the testator owned some bonds that were placed in a vault accessible to him and his nephew. The testator also said that "if anything happened" to him, he wanted his nephew to have the bonds. Until his death, the testator clipped the coupons from the bonds and collected the income himself. On these facts the court found insufficient evidence of a trust for the nephew. Noting that "the intention to create a trust should be clearly manifest-

---

10. Other cases cited by James are distinguishable for a variety of reasons. In two of them there was actual delivery. *Arizona Title Guarantee & Trust Co. v. Wagner,* 75 Ariz. 82, 88, 251 P.2d 897, 903 (1952); *Wakefield v. Wakefield,* 37 Cal.App.2d 648, 653–55, 99 P.2d 1105, 1108 (1940). In another there was constructive delivery. *Nelson v. Spotts,* 114 Colo. 72, 76–78, 162 P.2d 224, 226 (1945). In two the courts held that the putative donor and donee had formed a joint tenancy with respect to the contents of the safe deposit box, a theory not presented by James. *Miller v. Buck,* 271 F.Supp. 822, 828 (W.D.Va.1967); *City Bank & Trust Co. v. Leightner,* 67 Mich.App. 247, 250–52, 240 N.W.2d 762, 764 (1976). In four others there was writing by the respective donors on the property itself, indicating that it belonged to the donees. *Fotiatis v. Clemmons,* 134 Ga.App. 487, 488, 214 S.E. 2d 736, 738 (1975); *Dickson v. Dickson,* 231 Mo.App. 515, 520–21, 101 S.W.2d 774, 777 (1937); *In re Van Wert's Estate,* 66 N.Y.S.2d 7 (N.Y.Sur.Ct.1946); *In re Woodin's Estate,* 36 N.Y.S.2d 448 (N.Y.Sur.Ct.1942).

ed," *id.* at 248, 127 A. at 757, the court found "no indication of any design by [the testator] to create a trust. No present interest was transferred, and no fiduciary relation was defined by word or conduct." *Id.* at 249, 127 A. at 758.

■ Although *Moore* is not binding on us, we find it persuasive here because its facts are very similar to the facts in the instant case. The only evidence offered by James to prove the existence of a trust was the February 25 letter from Mary. Even when that letter is read in the light most favorable to James, it is insufficient to prove any intent on Mary's part to establish a trust. The meaning of her instructions was extremely vague, as was the identification of the alleged corpus. Although it is arguable that Mary may have intended to transfer to James a present interest in the bonds which existed as of February 25, 1976, *i.e.*, to make an *inter vivos* gift,[11] the letter simply cannot be read more broadly than that. Neither her words nor her conduct provided any evidence stronger than what was held to be inadequate in *Moore*. Guided by *Moore*, we hold that there was no evidence before the trial court sufficient even to raise an issue as to the existence of a trust.[12]

## V. DAMAGES

While the trial court ruled correctly in granting summary judgment for the estate on the merits of its counterclaim, the court incorrectly assessed damages for James' conversion of the eleven bonds he removed from the safe deposit box. Generally adopting the formula proposed by the estate, the court awarded the estate $29,-400.00, the fair market value of the six bonds retained by James; $11,927.50, the coupon interest received by James on all eleven bonds; $22,529.30, the proceeds from the sale of five bonds; and $5,959.05, pre-judgment interest, at eight percent per annum, on the proceeds from the sale of the five bonds and from the coupon income —a total of $69,815.85. We hold that the trial court erred in its calculation of damages except for the award of the sales proceeds (the third of these four amounts), and accordingly we remand this case to the trial court with directions to reassess the damages for those bonds which James has not redeemed.

### A. *The Time of Conversion*

"Conversion has generally been defined as any unlawful exercise of ownership, dominion or control over the personal property of another in denial or repudiation of his rights thereto." *Shea v. Fridley*, 123 A.2d 358, 361 (D.C.1956); *accord, Blanken v. Harris, Upham & Co.*, 359 A.2d 281, 283 (D.C.1976). The traditional standard for calculating damages for conversion is the fair market value of the property at the time of the conversion. *See, e.g., Mearns v. Chatard*, 47 App.D.C. 257, 265–266 (1918); *Kalb v. Vega*, 56 Md.App. 653, 665–67, 468 A.2d 676, 683 (1983), *cert. denied*, 299 Md. 427, 474 A.2d 219 (1984); DOBBS ON REMEDIES, *supra*, § 5.14, at 403.[13]

11. We have already held, of course, that James' assertion of an *inter vivos* gift must fail for other reasons. See part IV–A, *supra.*

12. There are cases in which courts have found the existence of a trust when securities have been placed in a safe deposit box. In those cases, however, there was either some writing which indicated that a trust had been created, *e.g., DeLeuil's Executors v. DeLeuil*, 255 Ky. 406, 74 S.W.2d 474 (1934); *In re Smith's Estate*, 144 Pa. 428, 22 A. 916 (1891); *Knagenhjelm v. Rhode Island Hospital Trust Co.*, 43 R.I. 559, 114 A. 5 (1921), or evidence that the alleged settlor-trustee recognized a fiduciary obligation to the putative beneficiaries, *e.g., Hardison v. Corbett*, 55 Cal.App.2d 310, 130 P.2d 226 (1942). *See generally* 1 SCOTT ON TRUSTS, *supra*, § 31.1.

13. Some state courts have devised various formulas for calculating damages for the conversion of marketable securities. *See* DOBBS ON REMEDIES, *supra*, § 5.14, at 403–405; Annotation, *Measure of Damages for Conversion of Corporate Stock or Certificate*, 31 A.L.R.3D 1286, 1305–1317 (1970). The District of Columbia, however, follows the majority rule and applies the traditional standard, *viz.*, the fair market value at the time of conversion. In *Mearns v. Chatard, supra*, 47 App.D.C. at 265–266, the court was not explicit as to which rule it was following, but in fact it used the date of conversion to determine the value of converted stock. In so doing, the court cited a Maryland case, *Merchants' National Bank v. Williams*, 110 Md. 334, 72 A. 1114 (1909), which expressly adopted the traditional formula. *Mearns v. Chatard, supra*, 47 App.D.C. at 262.

Thus a court deciding a claim of conversion must first determine when the conversion actually took place, for only when that is done can the damages be ascertained. In the case at bar that is a critical issue.

Determination of the date of conversion is important not only because the value of the converted property on that date must be computed, but also because that date establishes when title passes to the converter. In this case that is significant because James would be entitled to any coupon interest he received on or after the date of conversion, when title to the bonds legally passed to him. *See* Annotation, *Damages for Conversion of Stock, supra,* 31 A.L.R.3D at 1302; 89 C.J.S. *Trover and Conversion* § 173 (1955).

There are three dates on which it could be said that James converted the bonds. *See Kalb v. Vega, supra,* 56 Md.App. at 665–67, 468 A.2d at 683. First, James unlawfully exercised control over the bonds when he removed them from the safe deposit box immediately after Mary's death on October 2, 1981. W. KEETON, PROSSER & KEETON ON THE LAW OF TORTS § 15, at 93 (5th ed. 1984) (hereinafter PROSSER ON TORTS). Second, James acted unlawfully when he refused to return the bonds to the estate, their true owner, after the estate's representative learned in August 1984 that they had been removed and requested their return. *See, e.g., Boiseau v. Morrissette,* 78 A.2d 777, 780 (D.C.1951); *Horne v. Francis I. duPont & Co.,* 428 F.Supp. 1271, 1275 (D.D.C. 1977); PROSSER ON TORTS, *supra,* § 15, at 98. Finally, James converted five of the bonds when he redeemed them for cash. *See Mearns v. Chatard, supra,* 47 App.D.C. at 265; PROSSER ON TORTS, *supra,* § 15, at 96.

▆▆▆ Since the estate maintained that James converted five bonds by redeeming them, the trial court correctly computed damages for the conversion of those bonds when it awarded to the estate the proceeds from their sale. The sale price is an appropriate measure of a bond's fair market value at the time of conversion. *See Kalb v. Vega, supra,* 56 Md.App. at 665–67, 468

A.2d at 683. There is no triable issue of fact as to these five bonds, since James disputes only the finding of liability for conversion; he does not challenge the award of the sale proceeds as the proper measure of damages. It should be noted, however, that James is not entitled to any coupon interest on these five bonds since title did not pass to him until he redeemed them. This interest is properly included as part of the damages.

▆▆▆ The trial court erred in awarding to the estate the present fair market value of the six bonds remaining in James' possession. As we have said, conversion of these bonds occurred either upon James' removal of the bonds from the safe deposit box or upon his refusal to return them to the estate when asked to do so. The estate argued, and the trial court apparently agreed, that James committed a "continuing conversion" for the entire time he kept the bonds, so that the converted stock must be assessed at its market value on the date of the damage award. But there is no such thing as a "continuing conversion"; the tort of conversion is a discrete exercise of dominion and control which can occur only once. *Cf. Press v. Howard University,* 540 A.2d 733, 735 (D.C.1988) (rejecting assertion of a "continuing" breach of contract). The law regards a conversion as a forced sale of the converted property. *E.g., Horne, supra,* 428 F.Supp. at 1275. Once conversion occurs, title passes to the converter, whose continued possession thereafter is entirely lawful. *See generally* PROSSER ON TORTS, *supra,* § 15.

▆▆▆ We therefore remand this case to the trial court with directions to determine the date of conversion of the six bonds that James did not redeem and to compute the damages with reference to that date. The estate may be allowed to choose the date upon which the conversion occurred, either when James removed the bonds from the safe deposit box or when he refused to return them. *See Mearns v. Chatard, supra,* 47 App.D.C. at 265–266 (defendant pledged plaintiff's stock, redeemed it, and pledged it again; "therefore he was liable for [conversion] either as of the date of the

first or the second hypothecation," and plaintiff "could have selected one or the other"); *Kalb v. Vega, supra,* 56 Md.App. at 665–67, 468 A.2d at 683 ("[t]he fact that [plaintiff] may have been able to treat either or both of the first two acts as actionable conversions ... does not ... preclude his treating the third act also as a conversion").[14]

On remand, the trial court should be mindful of two important considerations. First, James is entitled to all the coupon interest from the date of conversion. The estate may recover as damages any interest that James received on the five bonds which he redeemed, since that interest accrued before conversion. But if the estate elects to treat James' removal of the six remaining bonds from the safe deposit box as the act of conversion, James is entitled to all the interest on those bonds that he received thereafter. Similarly, if the estate treats James' refusal to return the bonds as the act of conversion, James may keep the interest he received after the date of that refusal.

Second, James may very well dispute the calculation of the bonds' market value on the date chosen for determining damages. He previously presented evidence that the calculation of current market value was factually incorrect. If he offers evidence on remand sufficient to raise a triable issue as to the value of the bonds, summary judgment will be inappropriate, and the damages will have to be determined by a trier of fact.

### B. *Pre–Judgment Interest*

The trial court awarded to the estate, as part of its damages for conversion of the bonds, $2,975.93 in pre-judgment interest on the proceeds of the sale of the five bonds and $2,983.12 in pre-judgment interest on the coupon income that James received on all eleven bonds. James contends that pre-judgment interest may not be awarded at all. Alternatively, assuming that it is available, he argues that the court erred in calculating the amount.

The availability of pre-judgment interest in a case such as this has not been recently addressed in the District of Columbia, at least not in a case binding on this court. To be sure, the United States Court of Appeals has held that "neither common law nor the District of Columbia Code provides for the award of pre-judgment interest in tort actions in the District of Columbia." *Schneider v. Lockheed Aircraft Corp.,* 212 U.S.App.D.C. 87, 108–109, 658 F.2d 835, 856–857 (1981), *cert. denied,* 455 U.S. 994, 102 S.Ct. 1622, 71 L.Ed.2d 855 (1982). But *Schneider* is not binding on us, *see M.A.P. v. Ryan,* 285 A.2d 310, 312 (D.C.1971), and its holding has twice been called into question by this court. In *George Hyman Construction Co. v. DiNicola,* 514 A.2d 1180, 1182 n. 4 (D.C.1986), the appellant argued that *Schneider* was wrongly decided. We did not consider that argument, however, because we held that the appellant was estopped from raising any issue as to pre-judgment interest. *Id.* at 1183. A few months earlier, in *Bell v. Westinghouse Electric Corp.,* 507 A.2d 548, 555 n. 5 (D.C. 1986), we took note of the *Schneider* holding but also pointed out that this court had never decided whether pre-judgment interest could be awarded in tort actions. This case requires us to decide that question.

There are two statutes in the District of Columbia which deal with the subject of pre-judgment interest. The first, D.C.Code § 15–108 (1981), authorizes an award of pre-judgment interest only in an action to recover a liquidated debt. Damages for conversion cannot be regarded as a liquidated debt, especially when (as in this case) both the date of conversion and the value of the converted property are in dispute. The second statute is D.C.Code § 15–109 (1981), which provides:

*Interest on judgment for damages in contract or tort.* In an action to recover damages for breach of contract the judgment shall allow interest on the amount for which it is rendered from the date of the judgment only. This section does not

---

**14.** The estate has already elected to treat the redemption date as the date of conversion for the five bonds that James redeemed, but that election has no effect on the estate's rights with respect to the six unredeemed bonds.

preclude the jury, or the court, if the trial be by the court, from including interest as an element in the damages awarded, if necessary to fully compensate the plaintiff. In an action to recover damages for a wrong the judgment for the plaintiff shall bear interest.

We interpret this section as authorizing post-judgment interest in both tort and contract cases, but pre-judgment interest only in contract cases. The second sentence, as we read it, relates back to the first and is limited by it to actions for breach of contract. Our reading is supported by the original version of the statute, in which the language now in the second sentence was part of the first.[15] On the other hand, there is nothing in section 15–109 that prohibits an award of pre-judgment interest. We therefore conclude that pre-judgment interest in tort actions in the District of Columbia is neither authorized nor forbidden by statute.[16]

■■■ Thus we must examine the case law to determine whether pre-judgment interest may be included as part of the damages in this case. Once again we turn to *Mearns v. Chatard, supra,* which established the standard for calculating damages in an action for conversion. In *Mearns* the court stated that the defendant, in lending money that belonged to the plaintiff, "wrongfully converted it and thereby became obligated for it, *with inter-*

*est."* 47 App.D.C. at 262 (emphasis added). For this proposition the court cited two cases, one of which was *Merchants' National Bank v. Williams, supra* note 13, the Maryland case which announced a "general rule ... that, in an action of trover, the plaintiff is entitled to recover the value of the converted chattels at the time of the conversion, *with interest thereon to the date of the verdict."* 110 Md. at 349–52, 72 A. at 1117 (emphasis added). The law in Maryland is still the same. *See Kalb v. Vega, supra,* 56 Md.App. at 665–67, 468 A.2d at 683 ("the well-established measure of damages ... is the value of the property at the time of conversion, plus interest" (citations omitted)). The purpose of any award of damages for conversion, of course, is to provide to the injured party full compensation for his or her actual loss. 18 AM.JUR.2D *Conversion* § 117 (1985). Given that premise, the *Mearns* case, and the lack of any statutory prohibition, we hold that pre-judgment interest may be included as part of the damages in an action for conversion to the extent that it will make the injured party whole.[17]

We must therefore address James' further contention that the trial court erred in calculating the amount of pre-judgment interest. His specific argument is that the court was limited by D.C.Code § 28–3302(a) (1988 Supp.) to an interest rate of six percent,[18] and that the eight percent it award-

---

**15.** The predecessor of section 15–109 was enacted in 1901 as part of the original District of Columbia Code. It provided:

In an action to recover damages for breach of contract the judgment shall allow interest on the amount for which it is rendered from the date of the judgment only; but nothing herein shall forbid the jury, or the court, if the trial be by the court, from including interest as an element in the damages awarded, if necessary to fully compensate the plaintiff. In an action to recover damages for a wrong the judgment for the plaintiff shall bear interest.

Act of March 3, 1901, ch. 854, § 1185, 31 Stat. 1189, 1378. When several titles of the Code were re-enacted in the 1960s, the first sentence was divided into two sentences and slightly revised, but *the* substance was not changed. Pub. L. No. 88–509, § 3(b)(1), 78 Stat. 667, 677 (1964). The fact that the language authorizing pre-judgment interest was originally in the sentence pertaining to actions for breach of con-

tract convinces us that it relates only to contract actions and not to tort actions.

**16.** There is a third statute, D.C.Code § 15–110 (1981), which arguably may authorize pre-judgment interest. That statute, however, deals with contracts made or to be performed in another state or territory and is clearly not applicable to this case or to tort cases in general.

**17.** We note that pre-judgment interest is not unknown in other types of tort actions in the District of Columbia. *See District of Columbia v. Robinson,* 180 U.S. 92, 107–108, 21 S.Ct. 283, 288, 45 L.Ed. 440 (1901); *Washington & Georgetown R.R. v. Hickey,* 12 App.D.C. 269, 275–276 (1898).

**18.** D.C.Code § 28–3302(a) provides:

The rate of interest in the District [of Columbia] upon the loan or forbearance of money, goods, or things in action in the absence of expressed contract, is 6 percent per annum.

ed was too high. The estate initially sought pre-judgment interest at nine percent. James responded by suggesting that any such interest, if awarded at all, should be no more than eight percent. He later withdrew this suggestion, pointing out that it had been erroneously based on D.C.Code § 28–3302(c) (1988 Supp.), which applies only to post-judgment interest. Citing section 28–3302(a) instead, he urged the court to limit any award of pre-judgment interest to six percent.

The court awarded pre-judgment interest at eight percent, but without any explanation of why it chose that rate. This fact alone would normally require a remand to enable the trial court to state its reasons for deciding on eight percent, rather than the nine percent urged by the estate or the six percent urged by James. In this case, however, since the date of conversion of six of the eleven bonds will have to be determined, the amount of pre-judgment interest on the pre-conversion coupon interest on those six bonds, if any, will have to be recalculated as well. We therefore direct the trial court on remand to recompute the entire award of pre-judgment interest. Before doing so, it shall rule on James' contention that D.C.Code § 28–3302(a) limits any award of pre-judgment interest to six percent. If the court concludes that this statute applies, it shall use the six percent figure in its calculations. If it rejects James' argument and uses another rate, it shall place on the record its reasons for doing so.

## VI. ATTORNEY-CLIENT PRIVILEGE

The trial court ruled that Mary Lemp's attorney-client privilege applied against appellants in their litigation with Mary's estate. Appellants argue that the privilege cannot be invoked against them because they are Mary's heirs and legatees. This argument is without merit.

■ Appellants, as Mary's stepchildren, are not her heirs, but they are legatees because they are designated to receive property under Mary's will. See 26A C.J.S. Descent and Distribution § 34 (1956); 1 PAGE ON WILLS, supra, § 1.3. Never-

theless, their status as legatees does not override Mary's attorney-client privilege in an action brought by appellants against her estate.

The Supreme Court held in Glover v. Patten, 165 U.S. 394, 17 S.Ct. 411, 41 L.Ed. 760 (1897), that the attorney-client privilege does not apply in disputes between beneficiaries claiming under a will or heirs claiming through the decedent. However, when an heir or legatee makes a claim adverse to the estate, the estate may defend itself by invoking the privilege. See id. at 406, 17 S.Ct. at 416. Appellants do not dispute their bequests among themselves in this action, nor do they claim under Mary's will. Rather, they allege that Mary breached a contract not to revoke an earlier will and seek damages for that breach. Their claim, under Glover v. Patten, is clearly adverse to the estate, and thus the estate may invoke the attorney-client privilege on behalf of Mary in defending against that claim. See also De Loach v. Myers, 215 Ga. 255, 259–61, 109 S.E.2d 777, 780–781 (1959); Runnels v. Allen's Adm'r, 169 S.W.2d 73, 76 (Mo.Ct.App.1943); In re Smith's Estate, 263 Wis. 441, 447–49, 57 N.W.2d 727, 730 (1953).

## VII. ATTORNEY'S FEES

Appellee Keto, the executor of Mary's estate, initially petitioned Judge Pratt for permission to pay certain litigation expenses out of the estate's assets. Judge Pratt eventually denied that request, but without prejudice. After further proceedings, Keto again sought authorization to pay litigation fees, and this time Judge Barnes, to whom the case had been reassigned, authorized $222,261.00 as partial payment for these costs. Appellants argue that this award, in relation to the total estate assets, is excessive, and that the authorization was premature. While we reject the latter argument, we remand the case to the trial court for further proceedings with respect to the amount of attorney's fees.

### A. Standing

■ At the outset we hold that appellants have standing to challenge the award

of attorney's fees from the assets of the estate. The claims of a residuary legatee on an estate are subordinate to those of specific legatees, and payment of estate expenses comes first out of the residue of the estate unless the will provides otherwise. *Vogel v. Saunders,* 68 App.D.C. 31, 34, 92 F.2d 984, 987 (1937); 6 PAGE ON WILLS, *supra,* § 53.5. Therefore, William Stroman, the residuary legatee under Mary's will, would be the party most affected by the award of attorney's fees and litigation costs. But Stroman does not contest the award.

To maintain their challenge, appellants must also have a present, substantial interest in the matter at issue. 59 AM.JUR.2D *Parties* § 31 (1987). We are satisfied that appellants have a sufficient interest to give them standing. Should the residue of the estate be insufficient to satisfy the award of litigation expenses, under the principle of abatement, appellants' specific bequests would then be used as a source of payment. We note that the trial court's award represents a substantial portion of the estate, and that it is only a partial award, pending further litigation. Thus it is likely that more estate assets will be drawn upon to pay legal fees. Further, if the estate assets are insufficient to satisfy the respective specific bequests in full, the bequests will abate *pro rata.* 6 PAGE ON WILLS, *supra,* § 53.8.

▮▮▮ Moreover, we do not regard Stroman as an indispensable party to the proceedings. Neither a residuary legatee nor a specific legatee need be joined in a suit against the executors of an estate brought by other legatees or creditors of that estate. *Glover v. Patten, supra,* 165 U.S. at 402, 17 S.Ct. at 414; 2 V. MERSCH, PROBATE COURT PRACTICE IN THE DISTRICT OF COLUMBIA § 2246 (2d ed. 1952).

### B. *Merits*

At the initial hearing on attorney's fees, Judge Pratt sought to ascertain the reasonableness of Mr. Keto's request. The judge stated two main criteria for determining reasonableness: whether the services performed were necessary, and whether the requested amount was appropriate under all the circumstances, including in particular the size of the estate. Both of these factors were to be considered in light of the ultimate outcome of the litigation and the possibilities of settlement. Judge Pratt denied the motion for fees without prejudice because he could not determine the reasonableness of the fee request on the basis of the record then before him.

▮▮▮ Later, after Judge Barnes had granted summary judgment for the estate, she also granted Mr. Keto's renewed request for attorney's fees. In so doing, however, the judge did not explain how she found the claimed fees to be reasonable, and consequently this court has no way of knowing what factors she considered in reaching her decision. We therefore must remand the case either for reconsideration of the fee request or for an explanation of the basis for the original award. *See Stansel v. American Security Bank,* 547 A.2d 990, 994–996 (D.C.1988); *cf. Poe v. Noble,* 525 A.2d 190, 196 (D.C.1987) (award of fees to personal representative and attorney for estate was unsupported by findings, and was therefore an abuse of discretion). We hold in addition that the two factors articulated by Judge Pratt are appropriate and applicable to a request for attorney's fees in probate litigation. *See In re Hallenback's Estate,* 122 F.Supp. 212, 213 (D.D.C. 1954). We again stress—and note our concern—that the award represents a substantial part of the estate's assets and that it is only a partial award; the estate anticipates fees far greater than the amount it has thus far been authorized to expend. We are reminded of Charles Dickens' *Bleak House* and its celebrated case of *Jarndyce v. Jarndyce,* in which a large estate was totally consumed by the payment of litigation costs over a period of several years. That must not happen in this case.

▮▮▮ We do not agree with appellants that the award of fees was premature. D.C.Code § 20–752 (1981) provides that a personal representative is entitled to use estate funds for necessary expenses incurred during the defense of claims relat-

ing to the estate whether the defense is successful or not.[19] Hence the outcome of the litigation is not decisive so long as the expenditures are reasonable. Nor must the estate wait to petition for permission to pay specific expenses until the litigation has ended. *See, e.g., Estate of Stokley*, 108 Cal.App.3d 461, 466 n. 2, 166 Cal.Rptr. 587, 589 n. 2 (1980). That the estate sought fees at a point early in the litigation is only one factor among several for the court to consider in deciding the reasonableness of the fee award.[20]

## VIII. THE CLAIMS AGAINST THE LAWYERS

▉ The trial court granted summary judgment in favor of Arthur Peter and his law firm, Hamel & Park, on appellants' claims of malpractice [21] and breach of fiduciary duty. In pertinent part, the court's order reads as follows:

> The only acts and omissions complained of by the plaintiffs for which the plaintiffs have proffered any evidence and which might possibly be actionable are those acts and omissions occurring on or about May 30, 1973; however, the consequences of those acts and omissions were fully known to and appreciated by all the plaintiffs on or about July 3, 1979. In view of the fact that the plaintiffs purposely delayed bringing this action until

September 26, 1984, it is barred by the applicable Statute of Limitations.

We hold that the trial court erred in concluding that the statute of limitations began to run on July 3, 1979, and accordingly we reverse the grant of summary judgment to Mr. Peter and his partners in Hamel & Park.

### A. The Malpractice Claim

The statute of limitations applicable to this case requires that an action be brought within three years from the date on which the claim accrues. D.C.Code § 12–301(8) (1981). A cause of action usually accrues at the time of injury, but if "the relationship between the fact of injury and the alleged tortious conduct is obscure when the injury occurs, we apply a 'discovery rule' to determine when the statute of limitations commences." *Bussineau v. President & Directors of Georgetown College*, 518 A.2d 423, 425 (D.C.1986) (citations omitted); *accord, Knight v. Furlow*, 553 A.2d 1232, 1234 (D.C.1989). Under the discovery rule, "[t]he statute of limitations begins to run when the facts which form the basis of the claim are discovered, or reasonably should be discovered in the exercise of due diligence." *Interdonato v. Interdonato*,

---

**19.** D.C.Code § 20–752 provides in pertinent part:

> [W]hen a personal representative ... defends or prosecutes in good faith and with just cause any proceeding relating to the decedent's estate, *whether successful or not,* such personal representative shall be entitled to receive from the estate any necessary expenses and disbursements relating to such proceeding. [Emphasis added.]

**20.** In determining the reasonableness of legal fees, the court should be generally guided by the following factors, which are set forth in Disciplinary Rule 2–106(B) of our Code on Professional Responsibility:

> (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly.
> (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer.
> (3) The fee customarily charged in the locality for similar legal services.

(4) The amount involved and the results obtained.
> (5) The time limitations imposed by the client or by the circumstances.
> (6) The nature and length of the professional relationship with the client.
> (7) The experience, reputation, and ability of the lawyer or lawyers performing the services.
> (8) Whether the fee is fixed or contingent.

These factors have often been used to judge the reasonableness of attorney's fees in probate proceedings. *See In re Estate of Griffis,* 399 So.2d 1048, 1049 (Fla.Dist.Ct.App.1981); Annotation, *Amount of Attorneys' Compensation in Proceedings Involving Wills and Administration of Decedents' Estates,* 58 A.L.R.3d 317, 321 & n. 5 (1974).

**21.** Appellants have standing to sue for malpractice, notwithstanding a lack of privity between them and the attorneys of Hamel & Park. *Needham v. Hamilton,* 459 A.2d 1060, 1062–1063 (D.C.1983).

521 A.2d 1124, 1135 (D.C.1987) (citations omitted).

The trial court held that appellants "fully [knew] ... and appreciated" the alleged wrongdoing by Mr. Peter and his colleagues on July 3, 1979, when John Lemp, Jr., reviewed the file on his father's estate in the Probate Division of the Superior Court. On that occasion John noticed some peculiarities in his father's 1974 will and learned, to his surprise, that his wealthy father's estate had been administered as a small estate. John talked briefly with a lawyer present in the room, who advised him to take legal action. From these circumstances the trial court reasoned that appellants knew or should have known of their claimed injury.

The evidence does not support the court's reasoning. The discoveries made by John Lemp in July 1979 do not indicate any malpractice by Mr. Peter or his colleagues in May 1973.[22] There is no dispute that appellants did in fact expect their father's estate to pass to Mary; at most, John may have wondered why his father's personal effects had not been bequeathed to him and his brother and sister. The only possible impropriety uncovered by John in July 1979 was that his father might have lacked testamentary capacity to make his 1974 will, a matter of little or no importance to a claim of malpractice in 1973.

■■■ Appellants could not have learned of any possible malpractice by Mr. Peter until Mary died and left the bulk of her estate to her brother. Until then, appellants assumed that Mary would leave most of her estate to them, as they allege their father had intended. Only when appellants learned of their disinheritance, after Mary's death, could they have brought an action for malpractice.

Therefore, we hold that the earliest date upon which appellants could have discovered their alleged injury was October 2, 1981,

the date of Mary's death. Since the action against Mr. Peter and his partners at Hamel & Park was filed within three years after that date, the statute of limitations does not bar their malpractice claim.

### B. *The Breach of Fiduciary Duty Claim*

The same reasoning applies to appellants' claim that Mr. Peter and Hamel & Park breached their fiduciary duty. As to this claim also, we hold that the statute did not begin to run until October 2, 1981, at the earliest. We treat the fiduciary duty claim separately here only because appellees make an additional argument which is not supported by the record.

Appellees assert that the trial court made two separate rulings on appellants' claims. In their brief they refer to (and rely on) the trial court's "first ruling, which disposed of Count II of the Amended Complaint alleging a breach of fiduciary duties owed Colonel Lemp when Hamel & Park prepared a new will for Mary Lemp following Colonel Lemp's death." Appellants state in their reply brief that "it is by no means clear" that the court made such a ruling. We agree with appellants.

The only order in the record which purports to address either of appellants' claims on the merits is the one we have quoted at page 1143, *supra.* That order grants appellees' motion for summary judgment on the sole ground that the statute of limitations began to run more than three years before the filing of the complaint. We find it significant that the reference in appellees' brief to the court's "first ruling" is not accompanied by a citation to the record, as our rules require,[23] although the rest of their brief is replete with such citations. Notwithstanding this lapse, we have combed the voluminous record for some indication of this "first ruling," but we have found no evidence of it. We can only

---

**22.** The date of May 30, 1973, to which the trial court's order refers, was approximately the date on which the senior Lemps met with Mr. Peter and asked him to draft their wills.

**23.** Rule 28(a)(4) of the General Rules of this court requires that a factual statement in the

brief of a party include "appropriate references to the record," and Rule 28(a)(5) requires the argument portion of a brief to contain "citations to ... parts of the record relied on." *Accord,* Fed.R.App.P. 28(a)(3), (4).

conclude that appellees are mistaken in their recollection of what the trial court did.

█ Appellees raise certain questions relating to the evidence offered in support of appellants' breach of fiduciary duty claim. Since it does not appear that the trial court ever ruled on these questions, we refrain from considering them here, leaving them for the trial court to resolve in the first instance on remand. Two preliminary issues which the court on remand will have to address are, first, whether appellees Peter and Hamel & Park owed any fiduciary duty to these appellants, as distinct from their father and stepmother (who were the law firm's actual clients), and second, whether these appellants have standing to sue for an alleged breach of fiduciary duty to their father and stepmother. We express no view on either issue.[24]

### IX. CONCLUSION

In No. 86–352 we affirm the trial court's grant of summary judgment in favor of the estate on appellants' claim against the estate. We also affirm the trial court's grant of summary judgment on the estate's counterclaim against James Lemp to the extent that it holds him liable for conversion, but we reverse in part the award of damages against James Lemp and remand the case for recalculation of that award. In No. 86–727 we remand the case to the trial court for further proceedings with respect to the award of attorney's fees. In No. 86–1274 we reverse the grant of summary judgment to appellees Peter, et al., and remand the case for further proceedings.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

---

24. Appellants also argue that the trial court's refusal to consolidate the claims against the lawyers with the claims against the estate was an abuse of discretion. Under Super.Ct.Civ.R. 42(a), the court may consolidate two or more actions "involving a common question of law or fact." The decision on a motion to consolidate is committed to the sound discretion of the trial court. *Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan,* 374 A.2d 284, 287–288 (D.C. 1977).

Although the facts of these cases overlap to some extent, the legal issues are distinct. Appellants' action against the estate alleged that Colonel Lemp and Mary Lemp agreed not to revoke the mutual wills which they executed in 1973, while the action against the lawyers sought to prove that the estate plan which Mr. Peter drafted for the Lemps did not effectively carry out their intentions. In these circumstances we find no abuse of discretion in the trial court's refusal to consolidate.